108RBK

**Time of Request:** Monday, March 31, 2008   16:50:22 EST
**Client ID/Project Name:** 043843/000013
**Number of Lines:** 492
**Job Number:**        1821:84318087

Research Information

**Service:**   LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 1986 U.S. Dist. Lexis 27109

**Send to:**   CUNNINGHAM, EILEEN
          NIXON PEABODY LLP
          437 MADISON AVE FL 24
          NEW YORK, NY 10022-7001

LEXSEE 1986 U.S. DIST. LEXIS 27109

**MILTON A. LEVENFELD, et al., Plaintiffs and Counterdefendants, v. STANFORD CLINTON, Defendant and Counterplaintiff**

No. 83 C 3677

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

*1986 U.S. Dist. LEXIS 27109*

**April 7, 1986**

**OPINION BY:** [*1] SHADUR

**OPINION**

MILTON I. SHADUR, Judge

*MEMORANDUM OPINION AND ORDER*

Milton Levenfeld and some (but not all) of the other former partners in the now-splintered law firm of Levenfeld & Kanter (for convenience plaintiffs will collectively be termed "Levenfeld," used as a singular noun, while the law firm will be treated as a plural noun) initially sued Stanford Clinton ("Clinton") to recover the reasonable value of legal services rendered to Clinton. Clinton in turn filed a three-count Counterclaim charging:

    1. breach of contract (Count I);

    2. malpractice (Count II); and

    3. breach of fiduciary duties (Count III); and seeking both compensatory and punitive damages.

Clinton has now moved under *Fed. R. Civ. P. ("Rule") 56* for summary judgment against Levenfeld, who has also moved under *Rule 56* for summary judgment on the Counterclaim's damage claims.[1] For the reasons stated in this memorandum opinion and order, Clinton's motion is denied and Levenfeld's is granted.[2]

    1 Levenfeld captioned his submission a "motion to strike," but a *Rule 12(f)* motion to strike is generally proper only to challenge "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Here Levenfeld relies on discovery materials to argue Clinton has not in fact suffered any damages. Hence his motion is more properly characterized as one for summary judgment under *Rule 56*. Levenfeld Mo. 1 n.* and Clinton Mem. 2 n.1 treat the motion as such.

[*2]

    2 Both sides have seen fit to burden this Court with volumes of paper (deposition excerpts and documents, as well as lengthy memoranda), perhaps subscribing to the theory (as to their own respective claims) that sheer bulk connotes the existence of material fact issues, precluding an adverse summary judgment -- but see *Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 54 U.S.L.W. 4319* (U.S. Mar. 26, 1986). Winnowing the wheat from the chaff was a formidable task, as was assembling the material into a workable form for a draft opinion to be reviewed, reshaped and recast by this Court -- tasks of winnowing, assembling and initial drafting all ably performed by this Court's law clerk Ann Marchaterre.

*Clinton's Summary Judgment Motion*

Because each litigant seeks summary judgment on the other's claim, requiring this Court to take differing perspectives on the facts (see nn.3 and 7), separate factual expositions will facilitate consideration of the motions. This opinion therefore begins with the evidence bearing on Levenfeld's claim.

*Complaint-Related Facts*

    3

    3 *Rule 56* principles impose on the party moving for summary judgment the burden of establishing

the lack of a genuine issue of material fact. *Korf v. Ball State University, 726 F.2d 1222, 1226 (7th Cir. 1984)*. For that purpose this Court must view the evidence (including any reasonable inferences) in the light most favorable to the non-movant -- here Levenfeld. *Hermes v. Hein, 742 F.2d 350, 353 (7th Cir. 1984)*.

[*3] Burton Kanter ("Kanter"), a partner in Levenfeld & Kanter, met Clinton (also a Chicago lawyer) in the late 1950s (Kanter Dep. 22-23). Thereafter they developed both a personal and a business relationship (*id*. at 96; Clinton Dep. 75-76, 325, 329-30).

Clinton retired from the law practice in 1966 (Complaint P14). [4] When he then decided to restructure his estate, he retained Levenfeld & Kanter because of their expertise in federal income, gift and estate tax matters (*id*. P15). From August 1966 to April 1980 Levenfeld & Kanter performed various estate planning and related legal services for Clinton, but they never billed for those services (Complaint P9; Ans. P9). Levenfeld & Kanter were dissolved as a partnership in April 1980 (Complaint P10; Levenfeld Dep. 69).

> 4   Clinton described his current occupation this way (Clinton Dep. 32):
>
> Q: Did you say you are a bum now?
>
> A: I am a bum.

At Levenfeld & Kanter each partner had "wide discretion" in charging fees to clients (Kanter Dep. 69-70), with the partner having primary responsibility for a client -- the billing partner -- handling billing matters regarding that client (Levenfeld Dep. 91-92, 96, 103). Billing partners [*4] decided how much time would be charged to a client and how much time would be written off (*id*. at 117-18). Kanter was the billing partner responsible for Clinton (*id*. at 96-97; Janger Dep. 96-97).

In 1970 Clinton told Kanter he disapproved of the quality and quantity of work a Levenfeld & Kanter partner -- Richard Janger ("Janger") -- had done on Clinton's estate (Clinton Dep. 122-23, 499). Clinton told Kanter he considered Janger's work "non-productive" and expressed concern about possible fees (*id*. at 123-24). Kanter told Clinton he would replace Janger (*id*. at 123). Clinton understood that when Levenfeld & Kanter completed their work Kanter and Clinton would sit down to discuss fees and Clinton would fix a fee he considered reasonable (*id*. at 123, 131-32, 138, 143, 499-500).

On June 21, 1971 Kanter sent a memorandum to Janger (part of Clinton Ex. 8) outlining Kanter's fee arrangement with Clinton:

> I told him that I understood the financial position he was in clearly since we had all of the information and that I was not looking for either immediate payment or necessarily cash payment []or necessary determination as to fee at this moment but rather to [*5] bring the matter to his attention to indicate that we really should be compensated at some reasonable point in time in some fair manner but that I was not necessarily locked into either our normal hourly rates or any other characteristic of our regular bill procedures. In fact I then went on to say that my purpose in bringing the matter up at this point was to specifically simply give him the [sic] information and then put the ball in his court to determine exactly what it is he wants to do and that there would be no kicking of the ball back once he made that determination. In other words at that point I literally let him be in a position to set the fee, determine how it is to be paid, when it will be paid, whether we participate in a deal, etc., etc.
>
> He seemed most appreciative of this approach and as I told him I am sure he will be fair. I indicated that I would trust his judgment as to fairness completely and be happy to go along with whatever decision he makes.
>
> He will give the matter some thought and in due course be back to us.

Janger's March 18, 1980 memorandum to Kanter (also in Clinton Ex. 8) refers back to that earlier memorandum:

> Your discussion with Stan [*6] placed the responsibility for fee determination up to us; unfortunately no one remembered that eight years ago you had left it up to him. Attached specifically is your memo from June 21, 1971 which says that you brought up the old fee matter, that you had obviously reviewed it at that time and that he should determine exactly what the fee structure should be.

On March 25, 1976 Clinton wrote to Janger (P. Ex. 1):

> 5. As to my account, without the assistance of the computer, the day is not far distant, I hope, when I will be able to sit down eye ball to eye ball and agree upon

and pay an amount that is mutually acceptabe.

Clinton has never paid any fees for the services rendered by Levenfeld & Kanter (Complaint P9).

*Clinton's Summary Judgment Motion*

Clinton correctly says Kanter, as a Levenfeld & Kanter partner, had authority to enter into a binding fee arrangement with Clinton on behalf of Levenfeld & Kanter. *See* Ill. Rev. Stat. ch. 106-1/2, P9. Clinton then asserts Kanter agreed to allow Clinton to determine the amount of Levenfeld & Kanter's fee.

Clinton contends that agreement was an express fee contract, precluding Levenfeld's attempt here to seek [*7] recovery under a quantum meruit theory. *Laff v. Chapman Performance Products, Inc., 63 Ill.App.3d 297, 310, 379 N.E.2d 773, 783 (1st Dist. 1978)* (citations omitted) succinctly states Illinois law on the general principle on which Clinton relies:

> Defendants correctly contend that where a client and his attorney enter into an express contract for compensation, the express contract will control the compensation due the attorney and *quantum meruit* principles are not involved. . . . Clearly, when an express contract exists, a resort to *quantum meruit* principles is unnecessary because the attorney and client have already agreed on the value of the services.

See also *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp., 104 Ill.App.3d 357, 360-61, 432 N.E.2d 999, 1002 (1st Dist. 1982)*.

Levenfeld does not dispute that notion, responding instead with four different contentions:

> 1. Clinton's March 1976 letter (P. Ex. 1) creates a genuine issue of material fact as to whether Clinton possessed unilateral discretion to set the fee.
>
> 2. Because the express agreement contained no explicit price term, Levenfeld cannot recover under a contract theory [*8] and must recover under a quantum meruit theory.
>
> 3. Even if Clinton did possess the power to set the fee he would pay to Levenfeld & Kanter, a genuine issue of material fact exists as to whether Clinton acted in good faith in setting the fee at zero.
>
> 4. Even though the Complaint states a cause of action only under a theory of quantum meruit, plaintiffs can recover under a contract theory.

Because Levenfeld's first two arguments defeat Clinton's summary judgment motion, this opinion will not address Levenfeld's other contentions.

Clinton's summary judgment motion argues Kanter and Clinton explicitly agreed Clinton would set the fee for any work performed by Levenfeld & Kanter. That argument finds substantial support in the record:

> 1. Clinton Dep. 123, 131-32, 138, 143, 499-500 indicates Clinton understood he would fix a fee he considered reasonable.
>
> 2. Kanter's June 21, 1971 memorandum to Janger and Janger's March 18, 1980 memorandum to Kanter (both in Clinton Ex. 8) read much the same way.

But Levenfeld retorts Clinton's March 25, 1976 letter (P. Ex. 1) creates a fact issue by suggesting Clinton did *not* have sole discretion under the fee arrangement to set [*9] Levenfeld & Kanter's fee:

> 1. From this day on let us avoid to the maximum extent possible any increases in my obligation for either fees or disbursements.
>
> * * *
>
> 5. As to my account, without the assistance of the computer, the day is not far distant, I hope, when I will be able to sit down eye ball to eye ball and agree upon and pay an amount that is mutually acceptable.

Levenfeld argues persuasively Clinton's reference to a "mutually acceptable" fee belies his argument he alone could set the fee. Indeed Clinton's reference to "my obligation for . . . fees" is an odd locution for describing a *non*-obligation (for which Clinton now contends). [5]

---

[5] Of course any dispute as to material facts is enough to defeat a summary judgment motion,

for the court must take the perspective of the nonmovant. It should be observed, though, that the parties' factual versions are not necessarily as opposed as their present swords'-point positions suggest. Kanter's June 21, 1971 report on his conversation concluded this way:

> He will give the matter some thought and in due course be back to us.
>
> Kanter's entire approach -- an appeal to the sense of fairness of a client that lawyers might view as difficult in billing terms -- is scarcely unique. This Court has said much the same thing to an occasional client during the years when this Court was the principal billing partner in its own law firm. And one hoped-for result of that approach (really the optimum one) is the client's response in kind, by also expressing the desire to be fair and thus leaving the issue one for mutual agreement. That is certainly a reasonably expected potential result of the "give the matter some thought" statement in Kanter's memorandum. In that light, Clinton's March 25, 1976 letter looking to a "mutually acceptable" amount the lawyer and client could "agree upon" could well reflect the result of Clinton's promised "some thought" on the matter.

[*10] Clinton responds to that position with a scattershot attack, saying:

> 1. That factual dispute is not "outcome-determinative." See *Big O Tire Dealers, Inc. v. Big O Warehouse, 741 F.2d 160, 163 (7th Cir. 1984)*.
>
> 2. Clinton's uncontradicted testimony shows he did not intend to relinquish his power to set the fee.
>
> 3. Clinton and Kanter in fact agreed Levenfeld &

Kanter would not charge Clinton a fee.

None of those responses holds up under examination.

On the first issue, Clinton urges a dispute over the terms of an express agreement does not negate its existence. Because Levenfeld seeks recovery in quantum meruit, Clinton says Levenfeld's assertion of a factual dispute over the exact terms of an express fee contract can raise no genuine issue of *material* fact.

But that argument really mischaracterizes Levenfeld's position. Levenfeld does not simply challenge a term of an express contract. Instead, by saying no price term exists, Levenfeld argues the express contract never existed: Clinton's reference to a "mutually acceptable" fee constitutes nothing more than an "agreement to agree." And it is first-year contract law that such an agreement to make a contract [*11] in the future is not itself an enforceable contract. See *Lees v. Akshun Mfg. Co., 205 F.2d 577, 578 (7th Cir. 1953)*. Hence Clinton's March 1976 letter poses the issue whether an enforceable express fee contract ever existed. If not, Levenfeld is entitled to seek recovery under quantum meruit principles.

As for Clinton's second argument, Clinton Dep. 813 interprets the March 1976 letter to mean:

> I would fix the amount and I hoped that that would be agreeable to him and mutually acceptable to him. But I did not intend that sentence to surrender my right to fix the fee.

But Clinton's current statement as to his earlier intent cannot override the factual dispute that necessarily defeats his summary judgment motion. As *Fitzsimmons v. Best, 528 F.2d 692, 694 (7th Cir. 1976)* put it:

> What we have here, however, is a contract the meaning of which must be drawn from various letters, reports of conversations, and actions by the parties, all considered in the light of the circumstances surrounding the parties' actions. The interpretation of a contract, the terms of which are disputed, is very much a matter of the intent of the parties who entered into that contract. [*12] Questions of intent are particularly inappropriate for summary judgment.

Clinton's final contention also founders. He says he and Kanter in fact agreed Clinton would pay nothing to Levenfeld & Kanter (Clinton Dep. 197, 198, 200, 213):

> Q: So when did you tell Burt that you weren't going to pay him any fees?
>
> * * *
>
> A: I think it may have been in '80 sometime. It was in my house as I recall. Burt was there. He says nothing. I said, "Burt, nothing, absolutely not a quarter," I said.
>
> * * *

Q: And what did Mr. Kanter say to you?

A: Well, he expressed disappointment, and I think he felt that it wasn't fair.

* * *

Q: So it is your recollection now that you had this discussion about fees with Mr. Kanter sometime in December of 1980?

A: I believe we did, but I don't place it independently. This may be the meeting.

* * *

Q: Okay. And what are the -- what are the facts that you base your statement that you believe Mr. Kanter acquiesced in your position with -- on fees? Is there any fact that leads you to conclude that?

A: Well, I don't remember the exact words he used, but both his words, whatever they were, and his demeanor was one of resigned acceptance that he wasn't going [*13] to fight with me about it.

But those statements at most indicate Clinton's unilateral decision not to pay fees to Levenfeld & Kanter. If no express contract existed granting Clinton the power to make such a unilateral decision, Clinton's actions are irrelevant. And Clinton's description of Kanter's response to Clinton's announcement seems ambiguous at best.

Moreover, that alleged discussion took place after Levenfeld & Kanter dissolved in 1980. Nothing in the record indicates Kanter still had authority to bind the partnership *after* its dissolution. See Ill. Rev. Stat. ch. 106-1/2, P35.

In summary, Levenfeld's first attack on Clinton's summary judgment motion is successful. That alone would be enough to put the parties back on the track toward trial. But it is worth noting that Levenfeld's second point, though somewhat related to the first, is independently valid. *Laff*'s already-quoted rationale for rejecting reasonable-value recovery in the face of an express contract is that "a resort to *quantum meruit* principles is unnecessary because the attorney and client have already agreed on the value of the services." By contrast, where the purported "express contract" [*14] reflects no agreement at all on the value of the services, that stated reason for the rule has vanished. Can the rule itself survive? As Clinton would have it, a mere refusal on his part to fix any fee (let alone to fix it at zero) would foreclose any collection of fees -- ever -- by the lawyers. That notion must be rejected in the present posture of this case. [6]

> 6  It is of course possible that the trier of fact would find (1) Kanter and Clinton had *agreed* that no fees would be paid unless Clinton in his sole discretion so decided and (2) that continued to be their operative agreement -- much like the law school example of leaving the portrait painter's compensation (if any) to the subjective judgment of the subject of the portrait. Under Illinois law such agreements are enforceable so long as the party with the unilateral power of decision acts in good faith. *Forman v. Benson, 112 Ill.App.3d 1070, 1077, 446 N.E.2d 535, 538-40 (2d Dist. 1983)*. In that event quantum meruit would indeed be inapplicable, not so much on the *Laff* principle as such but because the parties have specifically agreed the reasonable value of the services is what one party says it is.

*Levenfeld's* [*15] *Summary Judgment Motion*

As stated at the outset of this opinion, after Levenfeld had filed this suit to collect unpaid legal fees, Clinton in turn filed his Counterclaim seeking both compensatory and punitive damages. This opinion turns to the additional facts that bear on Levenfeld's summary judgment motion against Clinton on the Counterclaim.

*Counterclaim-Related Facts*

[7]

> 7  This further factual statement conforms to the principles stated in n.3, with this Court's view of the evidence and all reasonable inferences drawn in the other direction -- in Clinton's favor. Because Clinton's counsel's submissions in opposition to the motion are notably murky, leaving it quite unclear in many respects exactly what is claimed, the textual statement gives Clinton the benefit of the doubt by including some facts of doubtful relevance.

As already indicated, Clinton retained Levenfeld & Kanter in 1966 to restructure Clinton's estate plan (Clinton Dep. 726-27). As part of that plan, Kanter suggested in 1968 that Clinton establish a foreign trust (the "Trust")(*id. at 229*). On February 1, 1968 Clinton did so (D. Ex. B), designating Clinton's wife ("Zylpha") as its beneficiary and [*16] Castle Trust Company Limited ("Castle") as its trustee. Levenfeld & Kanter drafted the Deed of Settlement and recommended Castle as trustee (Kanter Dep. 164-65, 168-69).

Case 1:08-cv-00706    Document 45-2    Filed 03/31/2008    Page 7 of 13

Page 6
1986 U.S. Dist. LEXIS 27109, *

On February 14, 1968 Clinton and Castle entered into an annuity agreement (the "Annuity")(D. Ex. D). Clinton agreed to sell some stock in Hyatt Corporation and Hyatt Equities Corporation to Castle, in exchange for Castle's agreement to pay Clinton a certain sum every year for the full term of his life.

In 1970 or 1971 Clinton instructed Levenfeld & Kanter to structure the Trust so its assets would pass to the survivor when either Clinton or Zylpha died (Clinton Aff. P2). Clinton also wanted to remove his son Stan Jr. as a beneficiary of his estate, leaving only his son Bruce as a beneficiary (Clinton Dep. 208-09). Levenfeld & Kanter told Clinton they had eliminated Stan Jr. as a beneficiary (Clinton Aff. P1). But on December 6, 1985 Clinton discovered (*id*. P2):

> 1. Trust PVI(C)(1) still designated Stan Jr. as a beneficiary at Zylpha's death; and
>
> 2. Clinton was not in fact designated as a beneficiary on Zylpha's death.

On December 12, 1985 Zylpha exercised her Power of Appointment over the Trust [*17] to designate Clinton as a beneficiary in the event of Zylpha's death (*id*. PP3-4 and Ex. A).

In 1975 an Internal Revenue Service investigation into Castle's banking practices attracted widespread publicity (Clinton Dep. 378-79). Because of that adverse publicity Clinton decided to switch trustees (*id*.).

During the same 1975 time period, Levenfeld & Kanter discussed with Ian Paget-Brown ("Paget-Brown"), an attorney in the Cayman Islands, the establishment of a trust company to take over some trusts previously administered by Castle (Paget-Brown Dep. 34-35). Paget-Brown formed Lion Corporation, Ltd. ("Lion")(*id*. at 35), of which he was sole shareholder (*id*. at 12). When Paget-Brown formed Lion:

> 1. He had never before acted as a trustee (*id*. at 24).
>
> 2. Lion received from the Cayman Islands government a "Category B Restricted Offshore Bank and Trust" License to act as trustee only for clients of Levenfeld & Kanter (*id*. at 41; D. Ex. E); and
>
> 3. Lion's license to act as trustee was to expire December 31, 1979 (*id*. at 43).

When Lion took over the trusteeship from Castle (Clinton Dep. 536), Levenfeld & Kanter never advised Clinton of those facts [*18] (Clinton Aff. P9). Clinton Aff. P10 says if he had known those things he would not have advised Zylpha to consent to Lion's successor trusteeship.

In 1976 Clinton asked Janger to repatriate the Trust's assets "as soon as possible with as little pain, expense and taxation as is possible" (D. Ex. 38). Janger told Clinton the tax consequences of repatriation would "wipe[] out" the trust estate (Clinton Dep. 836; Boggio Dep. 92-93). Kanter, on the other hand, has always considered trust domestication a nontaxable event, though he recognizes other tax lawyers disagree with that conclusion (Kanter Dep. 233, 238).

In 1979 Paget-Brown asked Janger to identify the trustee to succeed Lion when Lion's license expired (Paget-Brown Dep. 283). Thereafter Paget-Brown incorporated Sisken Trustees Limited ("Sisken")(*id*. at 286-87).

In 1979 Clinton became concerned over Lion's management of the Trust. He told Kanter to remove Lion and Paget-Brown as trustees (Clinton Dep. 152-53). He also asked Kanter not to allow Janger to handle any of Clinton's affairs (*id*.). Despite those instructions, the next step in trust management was Janger's instruction to Paget-Brown to transfer the trusteeship [*19] to Sisken (Paget-Brown Dep. 286, 380-81). That was done, and Sisken appointed Guiness Mahon Guernsey Limited ("Guiness") as an investment advisor (Paget-Brown Dep. 126, 128). Clinton did not learn of Sisken's trusteeship until 1981 (Clinton Dep. 541-42). On May 27, 1981 Clinton retained Lloyd Boggio ("Boggio") as his attorney (D. Ex. 71). On June 23 Boggio appointed Bayeux Trustees Limited ("Bayeux") as trustee of the Trust (*id*.).

In July 1981 Clinton's accountant advised him repatriation of the Trust did not constitute a taxable event (Clinton Dep. 243-44). Clinton later did repatriate the Trust (*id. at 862*).

As for administration of the trust assets, in 1968 Clinton had instructed Levenfeld & Kanter to invest the Trust's assets in low-risk instruments of American banking institutions (Clinton Dep. 733; Boggio Dep. 215). Sisken changed those investments when it became trustee (Boggio Dep. 216). In November 1981 Clinton learned Guiness had invested the Trust's assets in British Pounds Sterling (Clinton Aff. P12). Because the value of British Pounds Sterling had fallen, the Trust's assets diminished (*id*.).

*Levenfeld's Contentions*

Levenfeld's attack on Clinton's Counterclaim [*20] involves a multipart argument that Clinton has suffered no damages:

> 1. Clinton suffered no monetary loss as a result of Levenfeld & Kanter's failure to structure Clinton's estate to conform to his testamentary intent.
>
> 2. Clinton lacks standing to assert a claim for injury to the Trust.
>
> 3. Levenfeld & Kanter had no duty to investigate the fees charged by Lion.
>
> 4. Clinton suffered no damages when Lion transferred the Trust to Sisken because the trust assets appreciated under Sisken's trusteeship.
>
> 5. Clinton cannot hold Levenfeld & Kanter liable for losses to the Trust under Bayeux because Levenfeld & Kanter no longer existed when Bayeux became trustee.

Levenfeld also argues Clinton cannot recover punitive damages.[8] Because Levenfeld's first two contentions are dispositive, this opinion need not deal with the others (which are subsumed under the second).

> 8   Clinton Mem. 3 & n.2 indicate Clinton seeks punitive damages for actions taken by Janger, Kanter and Biederman.

*1. Estate Planning Malpractice*

Counterclaim PP16, 17 and 37(a) allege Levenfeld & Kanter negligently failed to carry out Clinton's testamentary intent in structuring his estate. Levenfeld [*21] urges that negligence claim must fail because Clinton has shown no resulting damages.

*Chicago Red Top Cab Association, Inc. v. Gaines, 49 Ill.App.3d 332, 333, 364 N.E.2d 328, 329 (1st Dist. 1977)*(citation omitted) states the principle on which Levenfeld relies:

> A malpractice action by a client against his attorney is an action for damages and has no basis unless the client has sustained a monetary loss as the result of some negligent act on the part of the lawyer. . . . In other words, negligence even if proved is not actionable without resulting damage.

Levenfeld points to several undisputed facts to support his argument Clinton suffered no damages as a result of Levenfeld & Kanter's alleged malpractice:

> 1. Clinton admits he still retains the option to change his will at any time (Clinton Dep. 605-06).
>
> 2. Clinton never paid Levenfeld & Kanter for any of their work (*id. at 191, 197*).
>
> 3. Clinton never paid Kanter & Eisenberg for their work correcting Levenfeld & Kanter's previous efforts (*id. at 304*).

Clinton offers nothing in response to support a damage claim. Indeed, Clinton's counsel really conceded the force of that argument during a November [*22] 6, 1985 status hearing before this Court.

Those facts entitle Levenfeld to summary judgment on Clinton's claim for estate planning malpractice. That claim must be and is dismissed, because *Chicago Red Top Cab* makes clear no claim for malpractice exists in the absence of "monetary loss."

This ruling should not be misunderstood, however, as banishing the issue of Levenfeld & Kanter's asserted malpractice from this litigation. Though that conduct cannot provide the basis for an affirmative recovery against Levenfeld, it certainly bears on the reasonable value of the legal services rendered to Clinton. Depending on the nature and extent of malpractice that might be found, the Levenfeld & Kanter services could have been worth little or nothing to Clinton. Indeed, Levenfeld Mem. 7-8 concedes Clinton can still assert malpractice as a "setoff" against Levenfeld's claim (an inaccurate use of the term "setoff," but the thrust of the comment is right).

*2. Clinton's Standing To Assert Injury to the Trust*

Clinton's remaining claims seek recovery against Levenfeld & Kanter for their alleged malpractice in handling the Trust. Levenfeld challenges Clinton's standing to raise those [*23] claims in three ways:

> 1. Another lawsuit asserting the same claims is pending in the Cayman Islands.
>
> 2. Only a trustee can sue third parties for injury to a trust.
>
> 3. Under the Deed of Settlement itself (Clinton Ex. B), the right to assert claims on behalf of the Trust is reserved to the trustee.

Although Levenfeld does not prevail on all those grounds, each requires at least brief analysis.

Levenfeld first asserts the Cayman Islands action advances the same claims against Levenfeld & Kanter as Clinton's Counterclaim, thus precluding litigation of the Counterclaim in this action. That position is wholly without merit.

*Colorado River Water Conservation District v. United States, 424 U.S. 800, 817-19 (1976)* (citations omitted) identifies the principles governing the contemporaneous exercise of jurisdiction by state and federal courts: [9]

> Generally, as between state and federal courts, the rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction. . . ." *McClellan v. Carland, [217 U.S. 268, 282 (1910)]*. . . . As between federal district courts, however, though [*24] no precise rule has evolved, the general principle is to avoid duplicative litigation. . . . This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them. . . . Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention.
>
> * * *
>
> In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum . . . the desirability of avoiding piecemeal litigation . . . and the order in which jurisdiction was obtained by the concurrent forums. . . . No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination [*25] of factors counselling against that exercise is required. . . . Only the clearest of justifications will warrant dismissal.

Two factors here serve to reject not only any dismissal, but also any stay, in favor of the Cayman Islands action. First, the Cayman Islands lawsuit was filed in 1985 -- some two years after the Counterclaim was filed. Second, Clinton is not a party to the Cayman Islands suit, which was brought by Zylpha and Boggio. Consequently if Clinton otherwise has standing to assert the claims advanced in the Counterclaim, he can pursue his separate lawsuit.

> [9] *Colorado River* discussed "state-federal" concurrent jurisdiction and "wholly federal" concurrent jurisdiction. Of course the Cayman Islands are not a state, but in analytical terms their courts' position vis-a-vis the federal courts does not differ from that of a state court.

That failure of Levenfeld's first argument does not impair the second and wholly independent claim that only a trustee can sue to redress injuries to the Trust. On that score Clinton responds with four of his own contentions: [10]

> 1. Clinton has standing as a contingent beneficiary of the Trust.
>
> 2. Clinton has standing [*26] under the Annuity to complain about injury to the Trust.
>
> 3. Clinton has always acted on behalf of Zylpha in matters concerning the Trust.
>
> 4. Levenfeld is estopped to raise Clinton's lack of standing.

None of those contentions withstands scrutiny.

> [10] Clinton's counsel have written a February 12, 1986 letter to this Court that states in part, "Clinton does not necessarily agree that this issue [of standing] is to be decided by Illinois law. . . ." But that letter was written after the parties had filed the last in a series of voluminous briefs. Neither party had previously suggested the applicability of any other jurisdiction's law; counsel's February 12 letter indicated none; and this Court's independent review discloses no reason to look elsewhere. Clinton's counsel's hedging "oh-by-the-way" comment is not a responsible way to assert (or preserve) a legal issue. This Court will

accordingly treat Illinois law as controlling. *National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp., 779 F.2d 1281, 1284-85 (7th Cir. 1985)*.

As to the first point, Levenfeld initially argues Clinton cannot claim contingent beneficiary status because:

> 1. Zylpha's [*27] exercise of the Power of Appointment is ineffective under the original Deed of Settlement.
>
> 2. Even if Clinton did gain standing by becoming a contingent beneficiary when Zylpha executed the Power of Appointment, that event occurred in December 1985 -- more than two years after Clinton filed his Counterclaim. Standing must exist at the time an action commences. *People ex rel. Lee v. Kenroy, Inc., 54 Ill.App.3d 688, 692, 370 N.E.2d 78, 81-82 (1st Dist. 1977)*.

This Court need not resolve those issues. Even on the arguendo assumption that Clinton did enjoy the status of a beneficiary of the Trust, it is black-letter law that a trust beneficiary lacks standing to maintain a suit against a third person for injury to the trust. *Restatement (Second) of Trusts 2d* ("Restatement") P282(1)(1959)(cited favorably in *Axelrod v. Giambalvo, 129 Ill.App.3d 512, 519, 472 N.E.2d 840, 845 (1st Dist. 1984)*) provides (with limited exceptions not relevant here):

> Where the trustee could maintain an action at law or suit in equity or other proceeding against a third person if the trustee held the property free of trust, the beneficiary cannot maintain a suit in equity against [*28] the third person. . . .

See also 4 A. Scott, *Law of Trusts* §§281 and 282 (3d ed. 1967); G. Bogert, *Law of Trusts and Trustees* §869 (2d ed. 1962). Clinton thus cannot look to his claimed trust beneficiary status to sue Levenfeld & Kanter. [11]

> 11   Clinton seeks to invoke several Illinois cases, but they simply do not support his position:
>
> 1. *Burrows v. Palmer, 5 Ill.2d 434, 125 N.E.2d 484 (1955)* and *Pinzino v. Vogel, 91 Ill.App.3d 330, 424 N.E.2d 371 (3d Dist. 1981)* involved suits by trust beneficiaries against *trustees* -- a very different question indeed.
>
> 2. *Mamolella v. Mamolella, 73 Ill.App.3d 398, 392 N.E.2d 99 (1st Dist. 1979)* allowed a trust beneficiary to sue for possession in his own name, but the court relied on specific language in the Illinois Forcible Entry and Detainer Act to reach that result. Indeed *Mamolella* is simply illustrative of what has been a vexing question under the Illinois law of "land trusts" (the odd but useful device in which the trustee is legally considered to have the entire legal *and* equitable interest in the real estate, while the beneficiaries have the full power of direction and the right to the earnings, avails and proceeds of the property): As between trustee and beneficiaries, who has the right of *possession*, which is the controlling question in a forcible action (as contrasted with, say, an action for unpaid rent)?

[*29] Clinton's attempted claim to standing as an annuitant of the Trust is merely a change of labels -- it simply identifies Clinton as a beneficiary of the Trust under another name. To the extent Clinton says Levenfeld & Kanter jeopardized his ability to receive benefits from the Trust, Clinton stands in the shoes of a trust beneficiary and has the same lack of standing to claim an injury to the Trust.

Clinton next urges he always acted on Zylpha's behalf in handling Trust matters:

> 1. He issued instructions to Janger on Zylpha's behalf (Clinton Dep. 532-33).
>
> 2. Janger considered himself Clinton's lawyer -- not Zylpha's -- on trust matters (Janger Dep. 848).
>
> 3. Zylpha acknowledged Clinton "took care of" trust matters (Zylpha Dep. 82).

But that just rings another change on the same tune. Assume that Clinton *did* act as Zylpha's agent in Trust matters. Zylpha -- the Trust's beneficiary -- would herself lack standing to sue Levenfeld & Kanter, and Clinton as her agent cannot bootstrap himself into any greater basis for suit.

Clinton's last gasp is his argument that Levenfeld's conduct estops him from raising Clinton's lack of standing. *Jones v. Meade, 126 Ill.App.3d* [*30] *897, 902-03, 467 N.E.2d 657, 661 (4th Dist. 1984)* recites the six elements necessary for equitable estoppel:

> (1) Words or conduct by the party against whom the estoppel is alleged constituting either a misrepresentation or concealment of material facts; (2) knowledge on the part of the party against

whom the estoppel is alleged that representations made were untrue; (3) the party claiming the benefit of an estoppel must have not known the representations to be false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting the estoppel; (5) the party seeking the benefit of the estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of the estoppel must be in a position of prejudice if the party against whom the estoppel is alleged is permitted to deny the trust of the representations made.

Clinton Mem. 25 identifies several aspects of Levenfeld & Kanter's conduct as assertedly entitling Clinton to invoke equitable estoppel. But all those claimed actions share the fatal flaw of demonstrating [*31] no prejudicial change in position that would confer standing on Clinton to sue as a Trust beneficiary:

   1. Clinton points to no facts showing Levenfeld & Kanter fraudulently induced him to set up the Trust. Indeed the Trust still exists with Boggio as trustee (Clinton Dep. 30).

   2. Clinton does not claim Levenfeld & Kanter's alleged misrepresentations induced him to become a beneficiary. In fact Clinton complains he did not become a beneficiary soon enough.

Hence Clinton cannot invoke equitable estoppel to preclude Levenfeld from raising Clinton's lack of standing to sue as a Trust beneficiary.

Clinton Mem. 13-14 also claims Levenfeld & Kanter and Lion, Sisken and Paget-Brown acted as "co-conspirators" to maintain control over the Trust's assets. Even were that so, that assertion cannot blink the fact that Clinton still claims injury only as a beneficiary of the Trust. Levenfeld & Kanter's asserted status as co-conspirators does not change Clinton's position. To the extent Levenfeld & Kanter's acts injured the Trust and thereby Clinton as a Trust beneficiary, only the trustee has standing to redress the injury.

Nor is it necessary for this Court to rely solely on case [*32] law for this opinion's answer as to standing. Deed of Settlement PXIII(A)(vii) itself reserves to the trustee the right to assert claims on behalf of the Trust:

   Without prejudice to any powers which may expressly or by implication be vested in the Trustee under the provisions hereof and by law the Trustee shall have the following additional powers with respect to each separate trust

      * * *

   (vii) to settle compromise contest or abandon claims or demands in favour of or against the Trust Fund or any part thereof. . . .

Illinois courts have construed similar language to hold *only* a trustee can bring lawsuits on behalf of a trust. See *Axelrod v. Giambalvo*, 129 Ill.App.3d at 518-19, 472 N.E.2d at 845; cf. *First National Bank & Trust Co. of Evanston v. Simon*, 312 Ill.App. 214, 216-17, 38 N.E.2d 360, 361 (1st Dist. 1941).

Restatement §282(2) recognizes the right of a beneficiary to sue a third person where the trustee refuses to bring an action. But Clinton cannot avail himself of that exception to the general rule. Here Boogio, the current trustee, has filed an action in the Cayman Islands advancing the same claims pressed in the Counterclaim (Levenfeld App.). [*33] No reason exists to extend to Clinton the right to sue.

Finally, Counterclaim P33 (emphasis added) suggests Clinton suffered injuries distinct from those he incurred as a beneficiary of the Trust:

   Because L & K failed to provide Clinton with sound and knowledgeable tax advice, in breach of L & K's promises and representations and the Agreement, *Clinton lost certain tax advantages* in connection with the disposition of certain trust funds, resulting in losses of approximately $4,000.

As a purely pleading matter, that might be read as charging harm to Clinton as grantor rather than as beneficiary -- the kind of claim that would pose no standing problem. But the current motion is at the summary judgment, not the preliminary pleading, stage. In *Rule 56(e)* terms Clinton has failed to "set forth specific facts" to support that claim. Although the parties have deluged this Court with briefs and submissions, nothing in that paper blizzard supports the claim Clinton himself "lost tax advantages"

as a result of Levenfeld & Kanter's actions. That predicate for Clinton's Counterclaim also fails.

*Conclusion*

Clinton's summary judgment motion as to Levenfeld's Complaint is [*34] denied. As for Clinton's Counterclaim, there is no genuine issue of material fact on Levenfeld's summary judgment motion, and Levenfeld is entitled to a judgment as a matter of law. Accordingly the Counterclaim is dismissed.

108RBK

********** Print Completed **********

Time of Request: Monday, March 31, 2008   16:50:22 EST

Print Number:    1821:84318087
Number of Lines: 492
Number of Pages:

Send To:  CUNNINGHAM, EILEEN
          NIXON PEABODY LLP
          437 MADISON AVE FL 24
          NEW YORK, NY 10022-7001