# **EXHIBIT A**

# RENAN SUGARMAN, P.C.
ATTORNEY AT LAW

30 NORTH LASALLE STREET
SUITE 1530
CHICAGO, ILLINOIS 60602
E-MAIL: RSugarman@ameritech.net

TELEPHONE
(312) 578-9430

FACSIMILE
(312) 578-9431

FILE COPY

April 7, 2006

*Via Overnight Courier*

George Friedman
Director of Arbitration
NASD Regulation, Inc.
Office of Dispute Resolution
165 Broadway – 27th Floor
One Liberty Plaza
New York, NY 10006-1400

Re: *David Cikanek v. Joseph Stevens & Company, Inc., Kevin Brody, Leonard Inserra and Ross Inserra*

Dear Mr. Friedman:

Enclosed please find Claimant David Cikanek's original Statement of Claim and Uniform Submission Agreement and four (4) copies of each in the above-referenced matter. Also enclosed is my office's check No. 1885 in the amount of $1,575.00 to cover the associated filing fees. Claimant requests a panel of three arbitrators and Chicago, Illinois be selected as the hearing venue as that is where he resides.

In addition, please forward all future correspondence, notices, pleadings and any other papers or documents to my attention at the address listed above. Thank you for your assistance.

Sincerely,

Renan I. Sugarman
Attorney at Law

RIS/rsm

Enclosures

cc: David Cikanek (w/ encls.)

# RENAN SUGARMAN, P.C.
ATTORNEY AT LAW

30 NORTH LASALLE STREET
SUITE 1630
CHICAGO, ILLINOIS 60602
E-MAIL: RSugarman@ameritech.net

TELEPHONE
(312) 578-0471

FACSIMILE
(312) 578-9431

April 7, 2006

*Via Overnight Delivery*

George Friedman
Director of Arbitration
NASD Arbitration, Inc.
125 Broad Street, 36th Floor
New York, New York, 10004

    RE:    Initial Statement of Claim, David Cikanek ("Claimant" or "David") vs. Joseph Stevens & Company, Inc., Kevin Brody, Leonard Inserra and Ross Inserra ("Respondents")

Dear Mr. Friedman:

    My office has been retained by David Cikanek ("David" or "Mr. Cikanek") to recover damages caused by the fraud, misrepresentations, omissions, churning, unsuitable investment recommendations, unauthorized trading, negligence, negligent hiring and supervision and breach of fiduciary duty perpetrated by the Respondents. Accordingly, we have prepared this Initial Statement of Claim so that you may promptly commence the administration of this matter.

## Introduction

    The facts of this arbitration are some of the most egregious that one might ever come across. As detailed below, this is a case about three criminally indicted brokers who used a "pump and dump" scheme to take advantage of a retired, unsophisticated customer and bilk him out of his entire $800,000 investment nest egg--that had taken 15 years to build--in a mere 12 to 18 months. This is also a case about a brokerage firm that not only chose to look the other way but through its actions and inactions is responsible for the misconduct of these brokers and the harm and damages they inflicted upon the unsuspecting customer.

George Friedman
RE: David Cikanek v. Joseph Stevens, et al.
April 7, 2006
Page 2

## Claimant David Cikanek

David is a 65 year old retired janitor in ill health. He is an army veteran with a high school education. Presently, and during the time he dealt with Respondents, David lived in Chicago, IL. The two accounts at issue are 4A0-130601 (margin account) and 4A0-750046 (IRA account).

## Respondent Joseph Stevens and Co.

Joseph Stevens and Company, Inc. ("Joseph Stevens") is a full service brokerage firm headquartered in New York. The firm's CRD number is 35459.

## Respondents Kevin Brody, Leonard Inserra and Ross Inserra

Kevin Brody (age 37, CRD number 1912980), Lenny Inserra (age 33, CRD number 2702430) and Ross Inserra (age 39, CRD number 2631256), were David's financial consultants during the relevant period. In April, 2004, all three were indicted by the Manhattan District Attorney's Office on racketeering charges, including enterprise corruption, grand larceny and securities fraud, arising from a boiler-room scheme they operated which allegedly defrauded investors of millions of dollars. (A copy of the News Release is attached hereto as Exhibit "A").

## Respondents' Misconduct

David Cikanek could fairly be described as a very unsophisticated, conservative and frugal individual—the type of person who "saved the first dollar he ever earned." After getting out of the service, he worked as a janitor and has resided almost his entire life in a basement apartment.

Sometime in the mid 1980's, David received an inheritance from his mother's estate. With the money, he proceeded to open accounts at Fidelity Investments where his investments were limited to relatively conservative mutual funds and blue chip stocks. By early 2000, his accounts at Fidelity had grown to approximately $750,000 in value.

Around this time, David received a cold call from either Brody or one of the Inserra brothers. At the time, they were working at a brokerage firm called Silver Capital that was a division of LCP Capital which, according to the racketeering indictment, was a "criminal enterprise" that operated to bilk investors out of millions of dollars. In a classic "boiler room" tactic, they convinced David to make a small initial investment so they could show him how much money they could make for him. They almost immediately doubled the initial investment which is not surprising since they were allegedly manipulating the price of the stocks they promoted. Based on this incredible success, Brody and the Inserras convinced David to transfer his entire $750,000 Fidelity portfolio

George Friedman
RE: David Cikanek v. Joseph Stevens, et al.
April 7, 2006
Page 3

to them. Aside from his naiveté, they also took advantage of the fact that David's girlfriend was dying and he was extremely vulnerable and susceptible to their high pressure sales tactics.

Upon receipt of the portfolio, Brody and the Inserra brothers, without authorization, immediately liquidated all of the positions David held at Fidelity and proceeded, again without authorization, to invest his accounts in various highly speculative securities, including Aviation Holdings and Globalnet—two of the stocks which they manipulated according to the indictment. Brody and the Inserras employed margin to further fuel their rapid fire trading.

In November, 2000, the Inserra brothers and Brody left LCP Capital and joined Respondent Joseph Stevens. They told David that they had some dispute with their old firm and convinced him to follow them to Joseph Stevens. Thus, David's accounts were transferred to Joseph Stevens, including his positions in Globalnet. In fact, Joseph Stevens allowed the position in Globalnet to be used as collateral for the trading of various other speculative stocks on margin. Indeed, Brody and the Inserras trading of David's accounts at Joseph Stevens picked up right where they left off when they left LCP Capital.

The total evisceration of David's accounts was quick. Indeed, by the end of December, 2000, the accounts at Joseph Stevens had dropped in value to $42,000 due to the rapid fire trading and significant decline in Globalnet. By July 2001, David's margin account, which had been worth over $800,000, had a **debit balance of $41,000**. His IRA account, which had been worth about $110,000, is now worth $900. Thus, in just a little more than a year, David's entire portfolio, which he had built up over 15 years, was completely wiped out.

Incredibly, even after this devastation, the three brokers would continue to call David and tell him not to worry things would get better. They even had the gall to solicit David to give them more money to invest. Indeed, even after they were indicted in 2004, they continued to contact David. Equally incredible is that despite what Brody and the Inserras did to David and other customers, Joseph Stevens continued to employ them until April, 2005.

## Unauthorized Trading

The Respondents treated David's accounts as though they were discretionary, when in fact, no such discretion had been granted. The Respondents failed to obtain David's prior approval before purchasing or liquidating a position in the account. They would simply place an order at their own discretion without gaining David's authorization. The accounts, however, were not discretionary and Respondents needed to receive authorization before each and every purchase, with no exceptions.

George Friedman
RE: David Cikanek v. Joseph Stevens, et al.
April 7, 2006
Page 4

### Churning and Excessive Trading

Respondents excessively traded David's accounts. They maintained almost complete control over the accounts, indeed many of the trades were unauthorized. David followed virtually all of the Respondents' recommendations and had little, if any, personal knowledge of the thinly traded, speculative, Internet, biotechnology and technology stocks Respondents purchased for his accounts. Moreover, Respondents employed the use of margin to increase the borrowing power and make even more trades.

### Misrepresentations and Omissions

It is a violation of the Illinois Securities Law of 1953 to "make any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" (815 ILCS 5/12 G). "Whether a stockbroker made a material misrepresentation or omission depends upon whether a reasonable and prudent investor would attach importance to the facts or fact omitted or misrepresented in determining his choice of action in the transaction in question *Anvil Inv. Ltd. Partnership v. Thornhill Condominiums, Ltd.* 407 N.E.2d 645 (Ill.App. 1 Dist., 1980). In addition, a broker cannot make a knowing misrepresentation to a customer in order to induce the sale or purchase of a stock, nor can a broker recommend a security unless there is an adequate and reasonable basis for the recommendation *Rolf v. Blyth Eastman Dillon & Co.*, 424 F. Supp.1021 (S.D.N.Y. 1977); *Hanly v. SEC*, 415 F.2d 589, 597 (2d Cir. 1969). Misrepresenting the inherent risks of a particular investment or failing to disclose such risks when the broker knew or should have known the customer would rely on the misrepresentation or omission can give rise to liability *Lucas v. Downtown Greenville Investors Ltd. Partnership* 671 N.E.2d 389 Ill.App. 2 Dist.(1996), *Grey v. Gruntal & Co.*, [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) Sec.93,262 at p. 96 (S.D.N.Y. 1987). Moreover, incomplete disclosures or half-truths give rise to a duty to disclose whatever information is necessary to rectify the misleading information *Wallace Computers, Inc. v. David Noyes & Co.*, [1993-1994 Transfer Binder] Fed.Sec.L.Rep (CCH) Sec. 98,130 (N.D.Ill.1994).

The Respondents intentionally misrepresented and omitted to disclose the speculative and highly risky nature of the trading strategy they were employing and the securities they were purchasing for David's accounts. They also failed to disclose that they were artificially raising and manipulating the price of the stocks they were buying for his accounts, including Aviation Holdings and Globalnet. The withholding and intentional concealment of this highly relevant information is an omission under the Illinois Securities Law of 1953.

George Friedman
RE: David Cihanek v. Joseph Stevens, et al.
April 7, 2006
Page 5

### Unsuitable Investment Recommendations

The Respondents purchased and traded aggressive, speculative securities on margin with David's life savings. Respondents took extraordinarily large risks in David's accounts that were unsuitable given his investment objectives and prior investment history.

### Negligent Account Management

The Respondents failed to properly asset allocate David's accounts across different asset classes despite overwhelming evidence asset allocation is the single most important determinant in investor's investment returns. According to Gary Brinson, as outlined in his now famous study entitled *Determinants of Portfolio Performance* that appeared in the Financial Analyst Journal in 1986, 94 percent of an investor's investment return is derived not from market timing or stock selection but rather from asset allocation--how much is invested in stocks versus bonds and cash and then how each one is divided up from there. University of Chicago Professor Eugene Fama concluded in his study that 97 percent of all investment returns are determined by asset allocation determinations.

Despite overwhelming evidence of the outcome determinative importance of asset allocation, Respondents invested all of David's assets in speculative securities. No bonds, certificate of deposits or fixed income securities or even mutual funds were purchased for David.

### Causes of Action

### State Securities Law Violations

The conduct of Brody, the Inserras and Joseph Stevens directly violated the Illinois Securities Law of 1953. The aforementioned practices, representations and omissions by the Respondents tended to work a fraud and involved statements that lacked reasonable grounds. The Respondents obtained money by way of untrue statements of material facts. Additionally, Joseph Stevens is also liable for aiding and participating in the violations. David reasonably relied on the acts, practices, representations and omissions made by the Respondents and as a direct and proximate cause thereof, he has been damaged.

### Violations of Section 2310 Conduct Rules of the NASD

The Respondents violated Rule 2310 which provides that "in recommending to a customer the purchase, sale, or exchange of any security a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of facts available, including other security holdings, financial situation, and needs." Respondents apparently believed the trading of speculative, thinly traded, manipulated securities on margin was suitable for David, a retired, unsophisticated and conservative

George Friedman
RE: David Clikanek v. Joseph Stevens, et al.
April 7, 2006
Page 8

investor whose previous investment experience was in conservative mutual funds and blue chip stocks.

### Violations of Section 2110 Conduct Rules of the NASD

The conduct of the Respondents constituted a willful violation of Section 2110 of the NASD's Conduct Rules in that, in connection with the purchase and sale of securities, Respondents, individually and/or collectively, had the responsibility to observe high standards of commercial honor and just and equitable principals of trade; and engaged in acts, practices and courses of business which operated as a breach of such responsibility.

### Violation of Section 2120 Conduct Rules of the NASD

The conduct of each of the Respondents constituted a willful violation of Section 2120 of the NASD Conduct Rules in that, in connection with the purchase and sale of securities, they, individually and/or collectively, had the responsibility to not effect any transaction in, or induce the purchase or sale of any security by means of any manipulative, deceptive or fraudulent device or contrivance; and engaged in acts, practices and courses of business which operated as a breach of such responsibility.

### Violation of Section 3010 Conduct Rules of the NASD

It is apparent by the conduct of Respondents in dealing with the David's accounts that they received no meaningful supervision. The Respondents engaged in a pattern of purchasing unsuitable investments and treated the account in a discretionary fashion when in fact no such discretion actually existed. David's accounts were churned for the purpose of generating commissions. Respondents were involved in the manipulation of the price of the stocks they purchased for David's accounts. Respondents grossly misrepresented and/or omitted the risks associated with the securities they traded and discussed virtually nothing with the David about the fundamentals or the downside risks of the securities purchased. Respondents failed to asset allocate David's accounts despite overwhelming evidence that asset allocation is the single most important determinant in an investor's return. Respondents also inappropriately used margin to further leverage David's accounts.

According to the NASD Rules of Fair Practice Section 3010, Respondent Joseph Stevens had a duty to supervise its agents' servicing of David's accounts. They completely and utterly failed to do so. Upon information and belief, Respondent Joseph Stevens had no reasonable supervisory procedures in place and/or failed to follow such procedures to supervise these accounts.

### Breach of Contract

David entered into various contracts with Respondent Joseph Stevens. These contracts provided that Joseph Stevens would supply brokerage services in a legal, ethical and professional manner and in accordance with applicable rules and regulations of the securities industry. Joseph Stevens breached these contracts.

### Common Law Fraud and Misrepresentation

Joseph Stevens, through its agents, made material misrepresentations concerning facts and omitted other material facts, in conjunction with the purchase and sale of the securities discussed herein. Joseph Stevens, through its agents, also misrepresented the level of risk associated with the trading activity in the accounts and the appropriateness of the trading activity. These misrepresentations and omissions concealed the level of risk associated with these securities, which were highly speculative. David relied upon Joseph Stevens to be forthright in its dealings with his accounts. This fraud was conducted through and/or under the guidance of Brody, the Inserras and Joseph Stevens, all of whom are liable to David for fraud.

### Breach of Fiduciary Duty and Constructive Fraud

Joseph Stevens and its agents owed David a fiduciary duty, and that duty was breached, for the reasons described above. David placed complete confidence and trust in Joseph Stevens and its registered representatives to handle the investments, and there has been a breach of that trust to the detriment of the David and for the benefit of Joseph Stevens, Brody and the Inserra brothers.

### Respondent Superior

The conduct of Brody and the Inserras was performed within the scope and course of their employment as agents of Joseph Stevens in that, in connection with the purchase and sale of securities, they directly and/or indirectly performed services on behalf of Joseph Stevens; Joseph Stevens directly and/or indirectly induced the acts set forth above; all of the services were performed in the scope and course of the employment of Brody and the Inserras and therefore Joseph Stevens is jointly and severally liable with, and to the same extent as, Brody and the Inserras under the common law and statutory law of the State of Illinois.

### Negligence and Negligent Supervision

Respondent Joseph Stevens owed David a duty to use reasonable care in the conduct of its affairs, especially in supervising Brody and the Inserras. Joseph Stevens breached those duties as previously described and those breaches were the proximate cause of David's damages.

George Friedman
RE: David Cikanek v. Joseph Stevens, et al.
April 7, 2006
Page 8

### Negligent Hiring and Retention

Respondent Joseph Stevens was negligent in hiring Brody and the Inserras in that it knew or should have known that they were unfit for the job of registered representatives so as to create a danger of harm to third persons such as David. Moreover, Joseph Stevens continued to retain the three brokers--for almost 5 years--even after their outrageous conduct in David's and other customers' accounts. The unfitness of the three employees and Joseph Stevens' hiring and retaining them when it knew or should have known they were unfit was the proximate cause of David's damage. In addition, under Illinois law this cause of action allows for the recovery of punitive damages.

### Damages

As a result of the damages suffered by Claimant through the acts, omissions, breaches of duties, unsuitable investment recommendations, negligence, fraud, excessive trading, failure to supervise and negligent hiring and retention of Joseph Stevens, the Inserras and Brody, David Cikanek requests an award against the Respondents, jointly and severally, in an amount that includes the following:

1. actual damages in the amount of $800,000;

2. attorney fees and costs of arbitration, including but not limited to expert witness fees, expenses and accounting fees as specifically authorized under the Illinois Securities Law of 1953 (815 ILCS 5/13-A-2);

3. recovery of the margin interest charged to David over the life of the account;

4. lost opportunity damages measured by the difference between how the accounts performed and how they would have performed had they been properly and suitably managed;

5. lost interest at the statutory rate of 10 percent annually, as specifically authorized under the Illinois Securities Law of 1953 (815 5/13 A-1);

6. pre and post award interest at the statutory rate; and

7. punitive damages.

### Conclusion

Respondents' conduct in this matter is both outrageous and indefensible. With total disregard for David Cikanek and his best interests, they quickly and methodically

George Friedman
RE: David Ciknoek v. Joseph Stevens, et al.
April 7, 2006
Page 9

...devastated his accounts and caused him to lose all his hard earned money. The Respondents churned David's accounts, made wholly unsuitable investment recommendations and failed to disclose material and relevant information to David as specifically required under the Illinois Securities Act. Joseph Stevens negligently failed to detect these violations, negligently hired and retained the three brokers and utterly failed to supervise their activities. Because of Joseph Stevens' actions, omissions, misrepresentations, negligence, breaches of duties and failure to properly supervise, it, along with Brody and the Inserras, has become liable to David on a number of legal grounds, including, but not limited to, the following:

1. fraud;
2. sale of unsuitable investments;
3. negligence;
4. misrepresentations and omissions;
5. unauthorized transactions;
6. failure to supervise;
7. violations of the Illinois Securities Act of 1953 and NASD Conduct Rules;
8. breach of contract;
9. constructive fraud/breach of fiduciary duty;
10. negligent hiring and retention; and
11. churning.

The Claimant requests a hearing locale of Chicago, Illinois and a panel of three arbitrators.

We appreciate your immediate commencement of this arbitration, and if you should have any questions please do not hesitate to contact me.

Very truly yours,

Renan Sugarman