```
                                                                    1220BK
Time of Request: Wednesday, April 23, 2008   11:34:12 EST
Client ID/Project Name: les
Number of Lines: 220
Job Number:      1843:88904649

Research Information

Service:   LEXSEE(R) Feature
Print Request: Current Document: 1
Source: Get by LEXSEE(R)
Search Terms: 1990 U.S. Dist. LEXIS 3627
```

```
Send to:   RADOSZ, PETE
           KOKOSZKA & JANCZUR, PC
           140 S DEARBORN ST STE 1610
           CHICAGO, IL 60603-5299
```

LEXSEE 1990 U.S. DIST. LEXIS 3627

In the Matter of the Arbitration between R. MICHAEL LEBDA and BEVERLY A. LEBDA, Applicants. v. CHARLES SCHWAB & CO. INC., Respondent

No. 89 C 7840

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1990 U.S. Dist. LEXIS 3627*

**March 30, 1990, Decided**

**OPINION BY:** [*1] KOCORAS

**OPINION**

*MEMORANDUM OPINION*

CHARLES P. KOCORAS, UNITED STATES DISTRICT JUDGE

This matter is before the court on the parties' cross-motions to confirm and to vacate an arbitration award; Plaintiffs R. Michael Lebda and Beverly A. Lebda are seeking to vacate the award and Defendant Charles Schwab and Company, Incorporated seeks to confirm it. For the following reasons, the award is confirmed and the Lebdas' motion is denied.

*BACKGROUND*

At issue in this case is the validity of an arbitration award made by a panel of arbitrators at the Chicago Board Options Exchange. In the award, the arbitrators found for Schwab and rejected the Lebdas' claim that Schwab should reimburse them for substantial losses they sustained in an options account following the stock market crash of 1987. The Lebdas claim the award must be vacated pursuant to *§ 10* of the Federal Arbitration Act because the arbitrators were guilty of misconduct and abuse of power.

The relevant facts are as follows: The Lebdas opened an options account with Schwab on July 20, 1987. The account explicitly stated that it was merely a buy/sell agreement in which Schwab neither solicited orders nor gave advice regarding [*2] the risks or prudence of any particular trading decision. The account contract further provided that any controversy relating to the account would be settled by arbitration.

The Lebdas immediately began heavy purchasing in oil stock options, in particular Texaco and Occidental Petroleum, hoping that the price for these stocks would continue to increase. They maintained their "bullish" position throughout the late summer and early fall. The Lebdas, however, failed to foresee "Black Monday." Thus, they were still holding their options when, in the wake of the October crash, the stock market entered a period of substantial decline. The options expired worthless. After the dust settled, the Lebdas discovered they had lost roughly $ 160,000, about 80% of their net worth.

The Lebdas, however, felt that Schwab rather than they were responsible for their economic demise. Thus, on June 20, 1988, the Lebdas filed a Statement of Claim against Schwab with the Chicago Board Options Exchange. In doing so, they again expressly agreed to "abide by . . . any award" rendered by the arbitrators. It is a decision made by the arbitrators concerning the scope of the Lebdas' right of discovery on this claim [*3] which they now argue fatally tainted the arbitration proceedings.

The Lebdas' arbitration claim was divided into two distinct parts. The original claim was comprised wholly of assertions that Schwab was somehow responsible for the Lebdas' shockingly risky approach to the investment of their life savings. The Lebdas claimed that, despite all of Schwab's disclaimers and the fact that the account was

Case 1:08-cv-00706   Document 53   Filed 04/23/2008   Page 3 of 7

Page 2
1990 U.S. Dist. LEXIS 3627, *3

purely wholesale in nature, Schwab nonetheless had a fiduciary obligation to investigate the Lebdas for prior investment experience and expertise and to check the Lebdas' incoming orders for "suitability." As part of discovery on these allegations, the Lebdas sought, among other things, written proof of each of the 40-plus transactions which Schwab had executed on their behalf over the course of the account agreement. Schwab, however, objected to producing such documentary proof on relevancy grounds, arguing that the Lebdas' claim did not call into question the validity of Schwab's execution. The arbitrators agreed.

So, on March 21, 1989, the Lebdas promptly amended their claim to include allegations that every single trade execution which Schwab performed was somehow fraudulent. They did [*4] not say why they believed this nor did they provide any supporting facts. Under this blanket allegation of fraud, the Lebdas renewed their request for documentary proof that the trades Schwab actually made on behalf of the Lebdas were precisely the same as the information contained in the trade confirmation reports which Schwab sent out after each execution. Schwab still objected and the arbitrators still balked, reasoning that a conclusory fraud allegation was insufficient to support an order for such massive discovery. The Lebdas were told to bring back some indication of fraud before Schwab would be ordered to produce anything.

What the Lebdas came back with were time and sales reports from the Options Exchange. These reports are generated by the Exchange and based on information submitted by sellers of options. They indicate the type of option, the price it was sold for as well as the time it was sold. Time and sales reports do not identify who bought the options or even whether it was one buyer who bought the entire group sold. The Lebdas had obtained 31 such reports as they roughly corresponded to the information on the execution confirmations, in particular, to the time periods [*5] when the Lebdas' purchases were purportedly made. They complained of discrepancies between the time and sales reports and the trade confirmations and concluded that they had raised the necessary inference that would justify further discovery.

On June 2, 1989, a hearing was held by telephone between Mr. Lebda, Richard Dangerfield, Schwab's attorney, and Arbitrator Rode, to decide whether further discovery was indeed in order. Rode, however, rejected the Lebdas' position that there were necessarily inconsistencies between the time and sales reports and the confirmations. Rode reasoned that the time and place reports were good only to show how options were sold, not how they were bought. Thus, as long as the time and place reports showed a minimum of option activity to support the Schwab purchases during the relevant tune frame and at the reported price, there would be no inconsistency. In addition, since time and sale reports are produced solely from sellers' information, the fact that the Schwab's reported purchases were insufficiently supported by the sales reports would not necessarily indicate fraud by Schwab. It might simply reflect a seller's failure to supply the requisite information.

[*6] Nonetheless, Rode concluded that some justification by Schwab was in order. Accordingly, Rode ordered Schwab to give the 31 time and sales reports to an expert to determine whether there truly were inconsistencies. Also, Schwab was ordered to produce some written justification for these transactions.

Schwab produced its own in-house computerized order file which confirmed the original confirmation orders in all respects. It also produced additional support for the three to four purchases which were not backed up by sufficient sales at the specific price on the time and sales reports. For these, Schwab produced three receipts from the floor of the Options Exchange and four daily activity reports from the Options Clearing Corporation; these documents viewed the transaction from the buyer's perspective. Although the Lebdas were still not satisfied with the scope of their discovery, they were told to save any future argument for the full hearing.

The hearing on the merits took place on June 21, 1989. The issue relevant to this case, however, is not how the arbitrators decided the ultimate issues in the hearing but, rather, that they did decide them without allowing the Lebdas all [*7] of the discovery they sought. At the hearing, the Lebdas renewed their appeal for further discovery, claiming that they were entitled to it not only on relevancy grounds, but also as a matter of right under SEC regulations and the parties' brokerage contract. After Schwab put on its expert witness, who testified as to the consistency of the time and sales reports with the Schwab documentation, the Lebdas were allowed to cross-examine, which they did extensively in the hope of revealing a discrepancy.

The arbitrators, however, rejected the Schwab claim

for further discovery. First, they again rejected any claim that SEC regulations and the brokerage contract gave the Lebdas an absolute right to all the discovery sought. Instead, where the information has been demanded in discovery and on a wholesale basis long after the trades have been executed, the Arbitrators concluded that the traditional weighing of burden against relevance must govern. Second, they concluded that no further discovery was warranted in this particular case in light of the fact that the Lebdas had failed to show any inference of fraud from the time and sales reports. The arbitrators reasoned as follows:

One [question [*8] is] whether Schwab should be compelled to present further documentation respecting the fact that these trades took place as confirmed to Mr. Lebda. I think the panel is of the view that based on the evidence presented, we don't see a problem with the accuracy of the confirmations. I mean we see time and sales [reports] or other documents that reflect that for the trades that you had initially raised questions on that there were executions at those prices on those days. . . . I think Schwab has presented adequate documentation in these transactions from our perspective.

Hearing Transcript at 280-82. After this preliminary finding, the arbitrators went on to rule in Schwab's favor on the merits of both the breach of fiduciary duty and the fraudulent execution claims.

The Lebdas responded by filing this action to vacate the arbitration award in favor of Schwab under the Federal Arbitration Act, *9 U.S.C. §§ 1-14 (1988)*. They did nothing, however, in terms filing a notice of motion to resolve the matter. Accordingly, Schwab made the first move and moved to confirm the award pursuant to *§ 9* of the Act. The Lebdas oppose this motion by presenting their argument in favor of vacation under [*9] *§ 10*.

## DISCUSSION

### I. Motion to Strike

Before we reach the merits of the instant motion, there is a preliminary dispute over what evidence this court may properly use in reaching a decision. Specifically, the Lebdas have moved to strike documents which Schwab produced in conjunction with its reply brief in further support of its motion to confirm. The documents at issue are (1) an affidavit by Richard S. Dangerfield, counsel for Schwab throughout the arbitration proceedings, and (2) the Appendix, which contained some but not all of the documents which had been generated in the arbitration process.

The motion to strike must be denied. The Lebdas principal quibble with the new documents is that they were added after the Lebdas' answer brief was filed and, thus, could not be responded to. This who-has-the-last-word problem, however, is inherent in the litigation process; the party who replies has the last word. Had Schwab raised matters beyond the proper scope of reply, the Lebdas could have moved to file a sur-reply. Moreover, if the Lebdas had filed a notice of motion to vacate the award in the first place, they rather than Schwab would have had the right of reply. Beyond [*10] this, the Lebdas point to no flaw which would warrant striking the documents and indeed there are no such flaws present. All the submitted materials are either based on personal knowledge, as in the case of the affidavit, or relevant in and of themselves as legal documents. The fact that the Lebdas disagree with testimony in an affidavit or that other legal documents were also relevant to this case are simply not valid grounds to sustain a motion to strike.

### II. Merits

There is no question that the Lebdas' claims were arbitrable. Their brokerage contract provided for arbitration and they themselves invoked the underlying arbitration proceedings. Thus, unless the award must be vacated pursuant to *§ 10* of the Federal Arbitration Act, it must be confirmed.

*Section 10* provides four ways in which an arbitration award can become tainted from the ground up. It states, in relevant part, as follows:

In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was [*11] evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause

shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made. .

*9 U.S.C. § 10(a)-(d).*

Although the Lebdas raised subsections (c) and (d) in their original filing in this court, they have relied solely on the misconduct exception in their subsequent papers. [1] This is not surprising. There can be no abuse of power as long as the arbitrator decides matters within the scope of authority granted by the parties' agreement to arbitrate. With respect to the arbitrability of dependent issues such as discovery, it has been universally stated that the courts will presume a general arbitration clause to grant arbitrators sufficient authority to decide "everything, both as to law and fact, necessary to render an ultimate decision." See. e.g., *Peabody* [*12] *v. Rotan Mosle, Inc., 677 F. Supp. 1135, 1139 (M.D. Fla. 1987)*. And indeed, courts have regularly held that arbitrators have the authority to decide discovery issues. See. e.g., *Lashco, Inc. v. Erickson, 700 F. Supp. 960, 963 (N.D. Ill. 1988)* (Duff, J.). Thus, we are left with the allegation of misconduct.

> [1] The Lebdas also raised the argument in their original filing that the arbitrators exhibited a "manifest disregard of the law" in limiting discovery. We, however, will not address that doctrine here. First, the Lebdas appear to have abandoned the claim entirely, having neither addressed nor even mentioned the doctrine in their brief on these cross-motions. Second, the Seventh Circuit has recently refused to adopt the manifest-disregard-of-law standard as another way in which to pierce an arbitration award. See *Moseley, Hallgarten, Estabrook & Weeden v. Ellis, 849 F.2d 264, 267 n.7 (7th Cir. 1988)*. Thus, even had the Lebdas chosen to argue manifest disregard of law, they would have had to justify the doctrine's viability in this circuit.

Subsection (c) provides, in part, that an arbitration award should be vacated if "the arbitrators were guilty of misconduct . . . [*13] in refusing to hear evidence pertinent and material to the controversy." However, the courts have universally concurred that subsection (c) does not authorize a de novo inquiry into evidence admissibility. See. e.g., *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599-600* (3d Cir.), cert. denied, *393 U.S. 954 (1968)*. Rather, the emphasis is on whether basic notions of fairness and due process have been meted out to the parties. As one court has noted, the focus should be on whether "'the fundamental right to be heard was grossly and totally blocked.'" *Cobec Brazilian Trading, Etc. v. Isbrandtsen, 524 F. Supp. 7, 10 (S.D.N.Y. 1980)* (quoting *Cofinco, Inc. v. Bakrie & Bros., 395 F. Supp. 613*, 615 S.D.N.Y 1975)).

This judicial deference is particularly appropriate in an arbitration such as this, which was governed by Chicago Board Options Exchange arbitration rules. Under the Rules, it is generally assumed that the parties will get through discovery voluntarily. Indeed, Rule 18.22 requires the parties to cooperate in such voluntary discovery. But, where such cooperation does not result for whatever reason, the COBE Rules grant the arbitrators [*14] great discretionary authority with respect to setting the scope of discovery. Thus, Rule 18.4(g) states that an arbitrator is authorized "to require the submission of . . . documentary evidence as he, in his sole discretion, deems advisable." (emphasis added) As one judge in this district has written: "Since Congress enacted the Federal Arbitration Act to place arbitration agreements on the same footing as other contracts, . . . and as rule 18.4(g) is a part of the partes' agreement to arbitrate, [a reviewing] court [should be] reluctant to ignore Rule 18.4(g) and not support the arbitrators in their exercise of discretion." *Lashco, 700 F. Supp. at 963*. While *§ 10(c)* obviously limits this discretion to some degree, the scope of review is nonetheless a quite narrow one.

There are two potential means by which the Lebdas could argue that the arbitrators' decision to deny further discovery into the integrity of the trade executions denied them their basic right to be heard. First, they may focus on the clear relevance of such information to their fraud claim. In other words, they may directly challenge the arbitrators' conclusions with respect to burden and relevance. Second, [*15] they may take the position that, regardless of relevance, the SEC rules and the brokerage contract independently required Schwab to produce all the paperwork sought. We, however, reject both of these arguments.

Any arguments based on relevance would have to be rejected, even under a de novo standard. The Lebdas last-minute fraud claim, which claims that each and every Schwab execution was somehow skewed, is wholly conclusory. Indeed, it is difficult to grasp precisely how the Lebdas could have been injured by the vague fraud alleged. This is important because fraud allegations are not favored under the Federal Rules of Civil Procedure. Under *Rule 9*, fraud claims must be pled with particularity, that is, with some reference to the underlying factual support for the claim. Here, there is no such factual support. The facts merely indicate that the Lebdas main options expired worthless after the market crash of October 1987. This has nothing whatever to do with whether those purchases were actually made. The Lebdas' newspaper clipping, which refers to reported execution deviation in a completely different area of Schwab, does nothing to add such support. Thus, it is doubtful that the [*16] fraud claim could have even survived a *Rule 9* particularity attack if it had been filed in this court in the first instance. This is relevant to discovery because one of the principal reasons for the particularity requirement is "to bar fraud suits filed as a pretext to discovery." E.g., *Washington v. Baenziger, 673 F. Supp. 1478, 1482 (N.D. Cal. 1987)*. Given the fraud claim's woeful lack of particularity in this case, we will not disturb what we view as the generous compromise approach to discovery taken by the arbitrators.

The Lebdas, of course, rely much more heavily on SEC rules and language in the brokerage contract than on a relevancy argument. Their position is that they were entitled to documentary justification even without their arbitration claim and they wanted every shred of it. The Lebdas flatly reject the arbitrators' legal conclusion that the SEC rules and the contract provisions were not designed to create an absolute right to wholesale discovery long after the relevant transaction but, instead, were designed as a consumer protection device so that customers could obtain confirming information on single executions where some question had been precipitated by the [*17] initial confirmation ticket.

The problem with the Lebdas' position, however, is that they merely disagree with the arbitrators' construction without any precedential support whatsoever. The arbitrators were authorized to interpret the law and the brokerage contract in reaching a decision. Their interpretation is due a good deal of deference; indeed, it cannot be overturned unless it "so affects the rights of a party that it may be said he was deprived of a fair hearing." *Newark Stereotypers' Union, 397 F.2d at 599*. It is obvious that the Lebdas' unsupported disagreement with the arbitrators' interpretation of the legal principles at issue is insufficient to meet this heavy burden.

In fact, even if this court disagreed with the arbitrators' legal or contractual interpretation, it would still not be sufficient to vacate the award. Thus, in *Corbec, supra*, the court noted the oft-stated rule that "[a]n arbitration award will not be vaated for a mistaken interpretation of the contract or of the law, even when, in the courts' view, the arbitrators' opinion was clearly erroneous both in logic and result." *524 F. Supp. at 9*.

For the foregoing reasons, this court denies the Lebdas' [*18] motion to vacate the Chicago Board Options Exchange's arbitration award and grants Schwab's motion to confirm the award.

Dated: March 30, 1990

1220BK

********** Print Completed **********

Time of Request: Wednesday, April 23, 2008   11:34:12 EST

Print Number:    1843:88904649
Number of Lines: 220
Number of Pages: 5

Send To:  RADOSZ, PETE
          KOKOSZKA & JANCZUR, PC
          140 S DEARBORN ST STE 1610
          CHICAGO, IL 60603-5299