Case 1:08-cv-00706    Document 58-3    Filed 05/16/2008    Page 1 of 14
Case 1:08-cv-00706    Document 45-15    Filed 03/31/2008    Page 2 of 16

Page 1

LEXSEE 2007 U.S. DIST. LEXIS 23126

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Petitioner, v. WILLIAM B. SAVINO, CHRISTOPHER D. CHUNG, and KEVIN P. BRUNNOCK, Respondents.**

06 Civ. 868 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2007 U.S. Dist. LEXIS 23126*

March 23, 2007, Decided
March 23, 2007, Filed

**COUNSEL:** [*1] For Merrill Lynch, Pierce, Fenner & Smith Incorporated, Petitioner: Seth M Schwartz, LEAD ATTORNEY, Timothy Graham Nelson, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY.

For William B. Savino, Christopher D. Chung, Kevin P. Brunnock, Respondents: David Brian Wechsler, LEAD ATTORNEY, Wechsler & Cohen, LLP, New York, NY.

**JUDGES:** LORETTA A. PRESKA, U.S.D.J.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

OPINION AND ORDER

LORETTA A. PRESKA, United States District Judge:

The federal policy favoring arbitration erects a high barrier to overturning arbitration awards. The test for vacating an award is not whether a court disagrees with the arbitration panel's assessment of the evidence or its reasoning; it is not whether the Court, sitting without a jury, would have reached the same result or anything close to it; it is not whether the Court disagrees with the remedy or entertains not inconsiderable dubiety about the wisdom of the award; and it is not whether those later determined to be wrongdoers might be perceived to have received a windfall. Rather, both Congress and the Supreme Court have been explicit: an arbitration award may be vacated only if procured by corruption or fraud, if the [*2] arbitrators exhibited evident partiality, were guilty of misconduct, or exceeded their power. In addition, the Court of Appeals has permitted vacatur where a panel recognized clear law applicable to the case and then manifestly disregarded it. Because none of these exceptions to confirmation has been established, the Court must confirm the award.

INTRODUCTION

Petitioner Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") petitioned the Supreme Court of the State of New York for an Order vacating a portion of the arbitration award (the "Award") filed December 2, 2005, in the New York Stock Exchange arbitration (the "Arbitration"). Respondents William B. Savino, Christopher D. Chung, and Kevin P. Brunnock (collectively, "Respondents" or the "CBS Group") filed a notice of removal on February 3, 2006 and a cross-motion to confirm the Award on March 16, 2006.

Merrill Lynch is a Delaware corporation with its principal place of business in New York, New York, a broker-dealer and a member of the New York Stock Exchange (the "NYSE") and the National Association of Securities Dealers (the "NASD"). (First Amended Petition to Vacate the Arbitration Award, dated January 23, 2006, ("First [*3] Amended Pet.") PP 3, 8.) Respondents are residents of New Jersey and were stock brokers employed at Merrill Lynch's Fort Lee, New Jersey branch office during 2002-2003. (First Amended Pet., PP 4-6, 11, 13.)

JURISDICTION AND VENUE

Jurisdiction is proper in this Court pursuant to *28 U.S.C. § 1332*. Specifically, this Court has jurisdiction because Petitioner is a corporation incorporated under the laws of the State of Delaware having its principal place of business in the State of New York, and Respondents are all citizens of the State of New Jersey. Venue is

Case 1:08-cv-00706   Document 58-3   Filed 05/16/2008   Page 2 of 14
Case 1:08-cv-00706   Document 45-15   Filed 03/31/2008   Page 3 of 16

Page 2
2007 U.S. Dist. LEXIS 23126, *

proper in this district because the Arbitration took place in New York and the Award was issued in New York.

## FACTUAL BACKGROUND

### A. The Underlying Dispute

In the late fall of 2001, Respondents, who had formerly worked at UBS Warburg ("UBS"), approached Merrill Lynch about potentially joining Merrill Lynch and, in late 2001, were offered employment in Merrill Lynch's Fort Lee, New Jersey office. (First Amended Pet., P 10.) The CBS Group began work with Merrill Lynch on January 4, 2002, and as part of their employment, each member of the CBS Group signed a contract specifying compensation [*4] to be paid during the course of employment and what they would be owed if they were terminated for a reason other than "cause" as defined in the contract. (First Amended Pet., PP 10-11.) "Cause" in the Employment Contract is defined as follows: "a violation of Merrill Lynch's rules, regulations, policies, practices, and/or procedures; a violation of the rules or regulations of a regulatory or self-regulatory organization; criminal, dishonest, immoral, or unethical conduct, in the opinion of Merrill Lynch management, or neglect of duties." (Declaration of Adrienne Ward, executed on January 23, 2006, ("Ward Decl."), Exs. D, E, F, at p. 12.) In addition, each member was loaned a sum of money and signed a Promissory Note obligating the employee to pay back the money plus interest. (First Amended Pet., P 12.) Each Note provided that in the event of legal proceedings by Merrill Lynch against any member of the CBS Group to enforce the Promissory Notes, the CBS Group member promises to pay "reasonable attorneys' fees" to Merrill Lynch, but there was no other stated agreement with regard to attorneys' fees in either the Employment Contracts or the Promissory Notes. (First Amended Pet., P 12.)

[*5] Prior to Respondents' start date, Merrill Lynch placed Respondents under heightened supervision, which - according to Respondents - meant that Merrill Lynch should have been able to detect wrongdoing and put an end to it. (Respondents' Memorandum of Law in Opposition to Petition to Vacate and in Support of Cross-Motion to Confirm, dated March 15, 2006, ("Res. Opp. Memo") at p. 6.) During the course of their employment, Respondents contend that they were very successful and were praised highly and rewarded greatly by Merrill Lynch for their profitable business. (Id.) (See Affidavit of David B. Wechsler, Esq., executed March 15, 2006, ("Wech. Aff."), Exs. 11, 12.)

On October 3, 2003, Merrill Lynch discharged the members of the CBS Group for cause. (First Amended Pet., PP 13-14.) Pursuant to securities regulations and rules of the self-regulatory organizations of which Merrill Lynch is a member, Merrill Lynch is required upon certain events, including the termination of an employee registered with the NASD, to provide information to the securities industry Central Registration Depository ("CRD"). (By-Laws of the NASF, Art. V, Sec. 3(a); NYSE Rule 345, Supp. Mat. 345.17) (First [*6] Amended Pet., PP 8-9.) The CRD system is part of a comprehensive regulatory scheme governing the securities industry, which facilitates regulatory inquiries and investigations and allows for the sharing of information between firms about the employment credentials of brokers. (First Amended Pet. P 9.) Whenever a registered employee leaves the employment of the broker-dealer, the firm has thirty days to file a Form U-5, and, if the employee is discharged, the firm must supply the reason for the discharge. (Id.) (See Instructions, Rev. Form U-5 at 3, http://www.nasd.com/web/groups/reg_systems/documents/regulatory_systems/nasdw_015113.pdf.)

Merrill Lynch provided the draft language of the Forms U-5 to Respondents' counsel, who asked that certain language be added. (First Amended Pet., P 16.) After discussions with Respondents' counsel, Merrill Lynch added a statement to each draft Form U-5 to indicate that Respondents disagreed with the firm's reason for termination. (First Amended Pet., P 16.) On October 30, 2003, Merrill Lynch filed Forms U-5 stating that Mr. Savino and Mr. Chung were terminated after the firm concluded that each of them had "failed to follow specific directives [*7] and firm policy prohibiting certain short-term trading activities in mutual funds" and "had engaged in other related violations of Merrill Lynch policy." (First Amended Pet., P 17.) The Form U-5 for Mr. Brunnock stated that Mr. Brunnock was terminated after the firm concluded that he had "failed to follow firm policy prohibiting certain short-term trading activities in mutual funds" and "had engaged in other related violations of Merrill Lynch's policy." (First Amended Pet., P 17.)

### B. The Arbitration

On December 3, 2003, the CBS Group commenced the Arbitration by filing a Statement of Claim, seeking damages for alleged breach of the Employment Contracts, specifically payments that they would be owed had the terminations not been "for cause" as defined in the Contracts. (First Amended Pet., P 18.) Respondents also sought damages for defamation based on the statements in the Forms U-5, damages for *prima facie* tort, declaratory relief, and attorneys' fees. (First Amended Pet., PP 18-21.) Merrill Lynch denied the CBS Group's allegations and counterclaimed. (First Amended Pet., P 35.)

While the arbitration hearings were proceeding before the Arbitration Panel (the "Panel"), [*8] two regu-

Case 1:08-cv-00706     Document 58-3     Filed 05/16/2008     Page 3 of 14
Case 1:08-cv-00706     Document 45-15     Filed 03/31/2008     Page 4 of 16

Page 3

2007 U.S. Dist. LEXIS 23126, *

latory events occurred. On March 8, 2005, Merrill Lynch settled regulatory inquiries by the New Jersey Bureau of Securities, the Connecticut Department of Banking, and the NYSE, agreeing to pay $ 13.5 million dollars for failing to supervise adequately the CBS Group's business activities. (First Amended Pet., P 25.) On March 15, 2005, the CBS Group was sued by the State of New Jersey Bureau of Securities for fraud, and eventually each Respondent's brokerage license was revoked. (First Amended Pet., P 26.) Specifically, the Bureau's complaint alleged that the CBS Group had defrauded mutual fund companies and investors due to their market timing activity and defrauded Merrill Lynch during the hiring process. (Id.) (See Declaration of Timothy G. Nelson, dated April 14, 2006, ("Nelson Decl."), Ex. 5: Press Release of the Office of the Attorney General of New Jersey.)

On May 23, 2005, the CBS Group filed a First Amended Statement of Claim, adding additional defamation claims based on additional statements allegedly made by Merrill Lynch representatives in news articles and speeches. (First Amended Pet., PP 27-28.) The first newspaper article was an October 4, 2003 article in [*9] The New York Times, which stated that "Merrill Lynch fired three senior brokers for conducting inappropriate mutual fund trades" "whose names were not disclosed, [and who] were described as 'significant producers' who worked out of the New Jersey branch office . . . . They had joined Merrill Lynch in January 2002 and had allowed market timing periodically through the summer of 2003." (Ward Aff., Ex. C, Respondent's First Amended Statement of Claim, amended May 23, 2005, ("Resp. Statement of Claim"), P 102.) The article cited a quote from Merrill Lynch which stated that "[o]ur review had revealed certain instances of possible market timing. Consistent with this policy, disciplinary actions have been taken . . . ." (Id.)

A similar story appeared in The Wall Street Journal on October 6, 2003, which noted that "Merrill became aware of the improper trading last year . . . and senior management communicated to the three brokers that they were to stop allowing Millennium to make the mutual fund trades." (Id. P 103.) The article also mentioned that "the brokers were allowed to stay at the firm after assurances that the trading had stopped." (Id.) On November 20, 2003, [*10] The New York Post printed a story about Merrill Lynch's firing of two senior executives who were "responsible for recruiting and supervising the brokers dismissed from Merrill for suspected improper mutual fund trading" and went on to mention the names of the senior executives. (Id. P 105.) The article also stated that when the "three brokers first came over from UBS PaineWebber [UBS], Merrill paid the team a combined $ 10 million bonus . . . ." (Id.) Only one of the articles mentioned any of the Respondents by name. On November 30, 2003, The New York Post printed an article about Respondents' former employer, UBS's new strict market timing policy which had "sent packing more than two dozen brokers known for their market-timing predilections." (Id. P 107.) The article went on to note that three of those brokers, "including Christopher Chung, left UBS voluntarily in early January and . . . turned up at Merrill Lynch days later." (Id.) The article stated that "sources familiar" with the brokers' work at both Merrill Lynch and UBS said that the bulk of their success came from market timing. (Id.) The article then quoted a Merrill Lynch spokesman, Mark Herr, [*11] stating that: "[w]e had no knowledge that they had a market timing past . . . ." (Id.)

In addition to the newspaper articles, Respondents submitted two additional statements to the Panel as part of their Amended Statement of Claim. One of the statements was a memorandum sent from Mark Herr, of Merrill Lynch's Media Relations department, to senior Merrill Lynch executives which warned the recipients that The New York Post would be publishing a story about the "trio of financial advisors we terminated . . . in connection with market timing." (Id. P 109.) The memorandum stated that the newspaper article would suggest that "we knew them to be timers before we hired them" and went on to counsel that "[o]ur on the record reaction is to strongly deny that we knew of their timing past, and consistent with what we said two months ago, that the three did not disclose their timing activities or aspirations to us." (Id. P 109.) The other statement was an address delivered by James Gorman, President of Merrill Lynch's Global Private Client Group, on May 26, 2004, to the American Australian Association at the University Club in New York. Gorman stated: "Through all the market-timing [*12] scandals you have been reading about relating to mutual funds, we had to dismiss three individuals who were involved in market timing at Merrill Lynch. On the other hand, we had 13,497 who weren't." (Id. P 110.) Respondents also assert in their submissions to the Court that text of this speech was widely disseminated on the internet. (Res. Opp. Memo at p. 12.) Respondents claim that these statements were false and misleading and compounded the damage inflicted upon Respondents by their Forms U-5.

Prior to the close of evidence at the Arbitration, counsel for the CBS Group stated that the CBS Group was seeking attorneys' fees, while counsel for Merrill Lynch stated that Merrill Lynch was not seeking fees and objected to any award of legal fees. (First Amended Pet., P 44.) After the close of evidence, the parties each submitted memorandum of law of fifteen pages. (First Amended Pet., P 45.)

Case 1:08-cv-00706   Document 58-3   Filed 05/16/2008   Page 4 of 14
Case 1:08-cv-00706   Document 45-15   Filed 03/31/2008   Page 5 of 16

2007 U.S. Dist. LEXIS 23126, *

Page 4

Respondents called two nonparty witness. (First Amended Pet., P 31.) The first was a headhunter named Michael King, who worked to find employment for Respondents after they left Merrill Lynch. (First Amended Pet., P 31.) In November and December 2003, Mr. King sent correspondence to at least [*13] six potential employers in the securities industry stating that Respondents "[h]ave previously done mutual fund market timing." (First Amended Pet., P 31.) Mr. King included this information in correspondence to potential employers knowing that "Attorney General Spitzer had made a big issue of mutual fund market timing, there are a lot of investigations going on, and no major firm wanted to take on anyone at that point who was doing that kind of business." (First Amended Pet., P 31) (Tr. 3151-52.) Mr. King noted that "if the U-5 was clean" that "they [the CBS Group] would have been able to get a job." (Tr. 3160-3161.) Respondents argue that Mr. King was required to disclose what was on Respondents' Forms U-5 and what was readily available in press reports even if Respondents and Mr. King strongly disagreed with the contents of such. (Respondents' Sur-Reply Memorandum of Law in Further Opposition to Petition to Vacate and in Further Support of Cross-Motion to Confirm, dated May 25, 2006, ("Res. Sur-Reply Memo") at p. 8.)

Respondents also called an economics expert, Michael Soudry, who provided testimony related to Respondents' alleged damages for lost income. (First Amended Pet. [*14] , P 33.) Michael Soudry reached two conclusions for each Respondent: (i) a higher range of economic loss based upon Respondents' performance at Merrill Lynch and taking into account the proven potential of the QQQ model; and (ii) a lower, more conservative range of economic loss based upon Respondents' compensation as financial advisors prior to joining Merrill Lynch and performing services for Millenium. [1] (Res. Opp. Memo at pp. 13-14.)

> 1   The QQQ index is a New York Stock Exchange-traded index that is based on the Nasdaq 100. (Res. Opp. Memo, at p. 7.) Respondents devised a trading strategy in the QQQ index along with an outside statistical expert, Albert Oh. Respondents testified that, although they footed the bill for developing the QQQ, they had support from Merrill Lynch, including the use of a Merrill Lynch trader, Terry Lyons, who helped them engage in mock trades, a necessary step in testing the model. (Wech. Aff. Ex. 15 (Cl. 95)) (Tr. 955-959, 2833-35, 3262-67.)

Merrill Lynch attempted to introduce [*15] evidence of the pending New Jersey Bureau of Securities Exchange investigation of the CBS Group to the Arbitration Panel, but it was refused. (Tr. 2456-64.) Upon presentation of the investigative complaint evidence, the Chairman of the Panel noted that "[w]hat has transpired with other authorities or not is not my view, point of view, influential in our decision. Our decision is based on evaluating the testimony, the exhibits, the presentation of the case from both sides here. We are going to stick to that . . . . Other people's opinions is not too much of a concern to me, but I stand to be corrected if we decide otherwise." (Tr. 2461.) Then the Panel excused the parties and determined among themselves whether to admit the evidence. (Tr. 2462.) After private discussion, the hearing continued, and the Chairman noted on the record that the other arbitrators had endorsed his preliminary statement about the New Jersey Bureau of Securities evidence and that he was going to "sustain the objection to this particular document as part of [the hearing]." (Tr. 2462.)

The Panel did allow Petitioner's counsel to question Respondent Chung about the status of his securities license in the State [*16] of New Jersey, and Mr. Chung stated that he believed that his license had been temporarily suspended for several months. (Tr. 2463.) Mr. Chung also testified that he believed he already had suffered the most damage from the Form U-5 and that the revocation of his license a year and a half later "has a completely de minimis effect." (Tr. 2464-2465.)

C. The Award

On December 22, 2005, the Award was issued, granting the CBS Group its requested contract damages of approximately $ 1.5 million dollars, representing the amounts due under the contracts if termination was not for "cause," less the amounts outstanding on the promissory notes. (First Amended Pet., PP 39-40.) The Panel also awarded the CBS Group $ 12.5 million for "loss of income and pain and suffering resulting from [Merrill Lynch's] defamation of claimants." (First Amended Pet., P 41.)

The Panel denied the CBS Group's request for punitive damages, but awarded $ 576,036 in attorneys' fees "based on the agreement of the parties." (First Amended Pet., P 43.) The Panel also directed Merrill Lynch to amend the Forms U-5 so that the notice of termination read "was not for cause." (First Amended Pet., P 40.) The Panel [*17] did not explain the Award and did not state whether the award for damages relied on the Forms U-5 or the other allegedly defamatory statements attributed to Merrill Lynch. (First Amended Pet., P 42.)

DISCUSSION

I. Standard to Vacate an Arbitration Award

Case 1:08-cv-00706    Document 58-3    Filed 05/16/2008    Page 5 of 14
Case 1:08-cv-00706    Document 45-15    Filed 03/31/2008    Page 6 of 16

Page 5
2007 U.S. Dist. LEXIS 23126, *

Review of an arbitration award is governed generally by the Federal Arbitration Act (the "FAA"). The FAA provides that an arbitration award may be vacated if: (1) the award was procured by corruption, fraud or undue means; (2) the arbitrators exhibited "evident partiality" or "corruption"; (3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded their power. *9 U.S.C. § 10*. In addition, the Court of Appeals has recognized that an arbitration award may be vacated if it is rendered in "manifest disregard of the law." *Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 201-203 (2d Cir. 1998)*; see *J. Acciardo v. Millenium Securities Corp., 83 F. Supp. 2d 413, 417 (S.D.N.Y. 2000)*. The manifest disregard doctrine is severely limited. *Bear, Stearns & Co., Inc. v. 1109580 Ontario, Inc., 409 F.3d 87, 90 (2d Cir. 2003)* (citation omitted). It [*18] requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *J. Acciardo, 83 F. Supp. 2d at 417*. The doctrine applies only if: "(1) the arbitrator[s] knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrator[s] was well defined, explicit, and clearly applicable to the case." *Hoeft v. MVL Group, Inc., 343 F.3d 57, 64 (2d Cir. 2003)*; see *Wallace v. Buttar, 378 F.3d 182 (2d Cir. 2004)* (holding that "a federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law").

If parties to an arbitration agreement wish to know the arbitrators' reasoning, they may request that the arbitrators include it in the award, but there is no standard requirement that arbitrators explain their awards. *Hoeft, 343 F.3d at 68*. When arbitrators decline to provide an explanation for their decision, a reviewing court can only infer from the facts of the case whether "the arbitrator[s] appreciate[d] the existence of [*19] a clearly governing legal principle but decide[d] to ignore or pay no attention to it." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems, 103 F.3d 9, 12 (2d Cir. 1997)* (quoting *Merrill Lynch, Pierce, Fenner & Smith v. Bobker, 808 F.2d 930, 933 (2d Cir. 1986))*. In a case where there is no explanation provided for the award, a court must confirm the arbitrators' decision if there is a "barely colorable justification" for the outcome reached, *Wallace, 378 F.3d at 190* (citation omitted), even if the ground for their decision is based on an error of fact or an error of law, *Willemijn, 103 F.3d at 13* (citation omitted).

As the Court of Appeals noted recently in Wallace, "[o]ur cases demonstrate that we have used manifest disregard of the law doctrine to vacate arbitral awards only in the most egregious instances of misapplication of legal principles." *378 F.3d at 190*. Thus, the party seeking to vacate an arbitration award under the manifest disregard of the law standard faces a difficult road to show that the arbitrators made an error that was "so obvious that it would be instantly perceived [*20] by the average person qualified to serve as arbitrator." *Willemijn, 103 F.3d at 13* (citing *Merrill Lynch, 808 F.2d at 933*).

II. Defamation Claims

A. Choice of Law for the Defamation Claims

When examining defamation claims in this Circuit, courts look first to the conflict-of-law rules in the forum state, which is New York, and under New York law, the law of the jurisdiction having the greatest interest in the litigation applies. See *Lee v. Bankers Trust Company, 166 F.3d 540, 545 (2d Cir. 1999)*; Robert D. Sack, 2 Sack on Defamation: Libel, Slander, and Related Problems, § 15.3.2, Practising Law Institute, (3d ed. 2006). Under New York choice-of-law rules, the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern. *Lee 166 F.3d at 545* (quoting *Reeves v. American Broad Co., 719 F.2d 602, 605 (2d Cir. 1983)* (internal quotations omitted)); see, *Celle v. Filipino Reporter Enterprises, Inc., 209 F.3d 163, 175 (2d Cir. 2000)* (holding that in libel actions, "New York assumes that the state of [*21] the plaintiff's domicile will usually have the most significant interest in the case and that its law therefore should govern."). Also, for conduct-regulating rules, which includes discouraging defamation, the law of the situs of the tort controls under New York choice-of-law rules. *Lee, 166 F.3d at 545*; see also, *Machleder v. Diaz, 801 F.2d 46, 51 (2d Cir. 1986)* (applying New Jersey law to a defamation claim by a New Jersey resident about news broadcast by a New York television station concerning plaintiff's New Jersey business and stating that "[u]nder New York law a court must apply the substantive tort law of the state that has the most significant relationship with the occurrence and with the parties").

There is a nine-factor test that has been employed by some district courts in this Circuit to decide which state's law governs a defamation claim in cases of multi-state publication of defamatory material. See *Davis v. Costa-Gavras, 580 F.Supp. 1082, 1091 (S.D.N.Y. 1984)* (citing *Palmisano v. News Syndicate Co., Inc., 130 F.Supp. 17, 19 & n.2 (S.D.N.Y. 1955))*. [2] However, this nine-factor test has not been adopted [*22] explicitly by the Court of Appeals as reflecting New York law, and other district courts have noted that it has not found favorable use among recent New York decisions. See e.g., *Lee, 166 F.3d at 545* (noting that the nine-factor test would apply, "if at all," only in cases of multi-state publication of defamatory material); *Hatfill v. Foster, 415 F. Supp. 2d 353, 368 (S.D.N.Y. 2006)* (concluding that the nine-factor test if applied to the facts of the case would not change the result and that "use of the nine-factor test has been

Case 1:08-cv-00706   Document 58-3   Filed 05/16/2008   Page 6 of 14
Case 1:08-cv-00706   Document 45-15   Filed 03/31/2008   Page 7 of 16

Page 6
2007 U.S. Dist. LEXIS 23126, *

deprecated in recent New York decisions and does not likely represent the law of New York in multi-state libel cases"). Accordingly, the Court does not find it necessary to evaluate the choice of law under such a test but instead will focus on the aforementioned elements including plaintiff's domicile, the situs of the tort, and the state having the greatest interest.

> 2  The nine factors a court will look to in multi-state defamation claims are: (1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (7) the place of emanation; (8) the state where the libel was first seen; and (9) the law of the forum.

[*23]  B. Application of Choice of Law: New Jersey Law

As noted by the parties in their submissions, the Employment Contracts between Respondents and Petitioner did not include any choice of law provision. (Res. Opp. Memo, at p.19, n.39) (Ward Decl., Exs. D, E, F, the Employment Contracts between Respondents Brunnock, Chung, and Savino respectively, and Merrill Lynch.) The other facts, when evaluated under either the test which evaluates Respondents' domiciles, situs of the tort and a state's interest in the transaction or the nine-factor test, lead to the conclusion that New Jersey law should apply to the defamation claims. Both parties acknowledge that all Respondents reside and at all relevant times resided in New Jersey, their place of employment was New Jersey, and their Employment Contracts were executed in New Jersey. There are different statements that are alleged to be defamatory, some that would qualify as multi-state publications and others that would not qualify as multi-state publications. However, all of the publications at issue, The New York Times, The Wall Street Journal, and The New York Post, have wide circulation in New Jersey, and the Respondents were likely [*24] concerned primarily with the effect of the statements on the people who read them in New Jersey because that is where Respondents lived and where they sought employment after being terminated from Merrill Lynch. Thus, according to New York's choice-of-law rules, it is appropriate to apply New Jersey law to the Award for the defamation claims, which Merrill Lynch argues was made in manifest disregard of the law.

Under New Jersey law, "[d]efamation imposes liability for publication of false statements that injure the reputation of another." *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 563 A.2d 31, 44 (N.J. 1989). In order to prove defamation a plaintiff must establish, in addition to damages, that the defendant (1) made a defamatory statement of fact, (2) concerning the plaintiff, (3) which was false, (4) which was communicated to a person or persons other than the plaintiff, and (5) fault. *Singer v. Beach Trading Co. Inc.*, 379 N.J. Super. 63, 876 A.2d 885, 894 (N.J. Super. Ct. App. Div. 2005) (quoting *Feggans v. Billington*, 291 N.J. Super. 382, 677 A.2d 771, 775 (N.J. Super. Ct. App. Div. 1996)) (internal quotations omitted); see also *Kass v. Great Coastal Express, Inc.*, 152 N.J. 353, 704 A.2d 1293 (N.J. 1998). [*25] However, where the allegedly defamatory statements are within one of the four recognized categories of defamation per se, then the plaintiff does not have to prove damages, as damages are presumed. *Ward v. Zelikovsky*, 136 N.J. 516, 643 A.2d 972, 977 (N.J. 1994). A statement that imputes occupational incompetence or misconduct is considered a category of defamation per se. Id.

Where a plaintiff is a private figure and the speech is about an exclusively private concern, a traditional negligence standard of fault is applicable, which is defined as communicating the false statement while acting negligently in failing to ascertain the truth or falsity of the statement before communicating it. *Feggans*, 677 A.2d at 775. A public figure may not recover damages resulting from defamation unless the defendant made the statement with "actual malice," which reflects the belief that public figures enjoy less protection from defamatory statements than private figures because they have voluntarily exposed themselves to the increased risk of defamation. *Hill v. Evening News Co.*, 314 N.J. Super. 545, 715 A.2d 999, 1003-04 (N.J. Super. Ct. App. Div. 1998). Finally, the threshold [*26] issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning. *Printing Mart-Morristown*, 563 A.2d at 44.

New Jersey recognizes certain absolute and qualified privileges for statements that could otherwise be actionable as defamatory. A statement made in the course of judicial, administrative, or legislative proceedings is absolutely privileged and wholly immune from liability. *Erickson v. Marsh & McLennan Co. Inc.*, 117 N.J. 539, 569 A.2d 793, 805 (N.J. 1990). A qualified privilege enjoys a lower level of immunity and generally exists because a legitimate public or private interest underlying the publication outweighs the important reputational interests of the individual. [3] Id.; see *Gulrajaney v. Petricha*, 381 N.J. Super. 241, 885 A.2d 496, 506 (N.J. Super. Ct. App. Div. 2005). A communication "made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corre-

Case 1:08-cv-00706    Document 58-3    Filed 05/16/2008    Page 7 of 14
Case 1:08-cv-00706    Document 45-15    Filed 03/31/2008    Page 8 of 16

2007 U.S. Dist. LEXIS 23126, *

Page 7

sponding interest or duty, although it contains a criminatory matter, which, without this privilege, would be slanderous and actionable . . . . [*27] " *Erickson, 569 A.2d at 805* (quoting *Coleman v. Newark Morning Ledger Company, 375 29 N.J. 357, 149 A.2d 193 (N.J. 1959))*. This qualified privilege is based on the public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public. *Erickson, 569 A.2d at 805* (internal quotations omitted). New Jersey defamation law recognizes the existence of certain situations in which public interest considerations outweigh the interest in the protection of reputation, and persons are allowed to communicate without fear of being sued. *Feggans, 677 A.2d at 775-776*; see *Dairy Stores, Inc. v. Sentinel Publishing Co., Inc., 104 N.J. 125, 516 A.2d 220, 226 (N.J. 1986)* (noting that statements that receive a qualified privilege are ones that are made for the public welfare and recognizing examples of qualified privilege applied to statements regarding health, prevention of crime, and reports about public meetings).

> 3   While there is a qualified media privilege, the so-called fair-report privilege, which permits the publication of defamatory statements uttered in judicial or other public proceedings, *Darakjian v. Hanna, 366 N.J. Super. 238, 840 A.2d 959, 963 (N.J. Super. Ct. App. Div. 2004)*, that privilege does not apply to Merrill Lynch because Merrill Lynch is not a member of the media and was not merely conveying to the public statements that members of the public would have heard had they been present at the public proceeding.

[*28] In determining whether a qualified privilege is a defense, it is irrelevant whether the statement at issue was defamatory. *Feggans, 677 A.2d at 776*. Instead a court will examine the relationship of the parties, the persons to whom the statement is communicated, the circumstances attendant to the statement, and the manner in which the statement was made. Id. (citing *Swede v. Passaic Daily News, 30 N.J. 320, 153 A.2d 36 (N.J. 1959))*. However, New Jersey law notes that "a conditional or qualified privilege is limited as the title suggests." *Gulrajaney v. Petricha, 885 A.2d at 507*. The qualified privilege may be lost through abuse if (1) the publisher knows the statement is false or the publisher acts in reckless disregard of its truth or falsity; (2) the publication serves a purpose contrary to the interests of the qualified privilege; or (3) the statement is excessively published. *Feggans, 677 A.2d at 777* (citing *Williams v. Bell Tel. Lab., Inc., 132 N.J. 109, 623 A.2d 234 (N.J. 1993))*. In other words, the qualified privilege may be lost through proving the publisher acted with malice. *Bainhauer v. Manoukian, 215 N.J. Super. 9, 520 A.2d 1154, 1172 (N.J. Super. Ct. App. Div. 1987)*. [*29] The New Jersey Supreme Court has noted that "[a]lthough we discard the label [of malice], we adhere to the principle that to overcome a qualified or conditional privilege, a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity. *Erickson, 569 A.2d at 806*.

C. Form U-5 Defamation

During the Arbitration, Respondents presented evidence that the statements on their Forms U-5 as well as the statements made in the press, the directive from Mark Herr to Merrill Lynch senior executives, and the Gorman Speech caused them significant damages in terms of lost income and pain and suffering. (Res. Opp. Memo, at p. 19). Merrill Lynch originally asserted that the Award for defamation manifestly disregards clear New York law because statements in a Form U-5 are absolutely privileged and immune from liability. (First Amended Pet. P 44). However, while this action was pending before this Court, the Court of Appeals issued *Rosenberg v. Metlife Inc., 453 F.3d 122 (2d Cir. 2006)*, in which it noted that the question of what level of privilege, if any, applies to statements in a Form U-5, [*30] was an unsettled question of New York law and merited certification to the New York Court of Appeals. Consequently, Merrill Lynch noted the decision and withdrew its argument that the arbitrators manifestly disregarded controlling law in failing to conclude that the statements at issue were absolutely privileged.

Both of the parties agree that New Jersey courts have not addressed the issue of the privilege of statements in a Form U-5. (See Res. Opp. Memo, p. 28-29, Ward Aff., Ex. P at 5, n.3.) Thus, because Merrill Lynch has withdrawn its argument of absolute privilege of the Form U-5 statements under New York law and no New Jersey court has addressed the issue, it is possible that the Award could have been based, in whole or in part, on the statements in the Forms U-5, and such a result would not be in manifest disregard of the law. The Panel made no indication in the Award what law it was considering or that it was ignoring certain, clear law. In addition, the parties presented vastly differing accounts of the law of defamation and on the issue of privilege, and courts have noted that "any dispute between the parties as to what the law was would seem to preclude a finding of [*31] manifest disregard, perhaps unless the argument was so preposterous that absurdity would be obvious to the most causal observer." *Fellus v. A.B. Watley, Inc., 7 Misc. 3d 1016A, 801 N.Y.S.2d 233, 2005 N.Y. Misc. LEXIS 821, *10-11 (N.Y. Sup. Apr. 15, 2005)*. Thus, given the extreme deference granted to arbitration awards, *DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818 (2d Cir. 1997)*, and given that the New Jersey courts have not indicated

Case 1:08-cv-00706    Document 58-3    Filed 05/16/2008    Page 8 of 14
Case 1:08-cv-00706    Document 45-15    Filed 03/31/2008    Page 9 of 16

2007 U.S. Dist. LEXIS 23126, *                                                                 Page 8

what level of privilege, if any, applies to Form U-5 statements, the arbitrators could have found defamation based on statements in the Forms U-5 without manifestly disregarding the law. This conclusion is supported by the fact that as part of the Award, Merrill Lynch was directed to amend the Forms U-5 to state that the members of the CBS Group were fired "not for cause." (See Ward Decl., Ex. B, the Award).

D. Statements by Merrill Lynch Other Than on Forms U-5

Merrill Lynch asserts that to the extent the Award for defamation was based on other statements attributed to Merrill Lynch, it must be vacated because it is in manifest disregard of the law and evidence, is irrational, and violates public policy. (Memorandum of Law of Merrill Lynch in Support of [*32] Motion to Partially Vacate Arbitration Award, dated January 23, 2006, ("Merrill Lynch Memo"), at p. 17.) Merrill Lynch claims that the Panel was informed of the New York law of defamation and that a qualified privilege and correspondingly higher level of proof applies to matters involving an important public interest. (Merrill Lynch Memo at p. 18.) However, as described above, under New York choice-of-law rules, New Jersey law applies to the defamation claims, and thus the statements presented by the Respondents to the arbitrators as defamatory will be evaluated under New Jersey law. Merrill Lynch also states that the Panel was informed that, despite Respondents' assertion that Merrill Lynch's statements were per se defamatory, New York law required Respondents to prove actual damages, or else recovery had to be limited to nominal damages. (Merrill Lynch Memo at p. 19.)

1. Qualified Privilege for Merrill Lynch's Statements

Merrill Lynch argues that the Panel was informed that a qualified privilege applies to the statements because the privilege is derived from the *First Amendment*, where there is an important public interest in protecting free expression. (Merrill Lynch Memo [*33] at p. 18.) Merrill Lynch argues that, at the time the newspaper articles were published with statements by Merrill Lynch, there was widespread public interest in the subject of trading practices in mutual fund shares due to the September 3, 2003 announcement of New York State Attorney General's investigation. (Id. at p. 23.) While, as discussed above, qualified privileges do exist when public interest weighs more heavily than private reputational interests in favor of disclosure of possibly defamatory statements, the arbitrators could have determined that such a privilege did not apply to Merrill Lynch's statements. Such a finding would not be in manifest disregard of the law because the qualified privilege applies differently depending on the unique circumstances of the case, the relationship of the parties, and the interests involved. *Feggans*, 677 A.2d at 776. While there may have been public interest in the issue of market timing at the time the statements by Merrill Lynch were made, it is not in manifest disregard of any explicit law that the arbitrators could have found that the Respondents' personal interests in their reputations outweighed any public interest [*34] or public welfare concerns that may have been served by Merrill Lynch's published comments. They also could have found that the statements not on Forms U-5 were excessively published and thus not subject to the privilege.

2. Statements and Defamation Per Se

Merrill Lynch argued to the Panel and in its submissions to the Court that the statements in the news articles as well as the Gorman speech and the Herr directive were not per se defamatory because there was not sufficient evidence for the Panel to find that the Respondents suffered direct injury from the statements. However, Respondents did present such evidence, through their own testimony, as well as through the testimony of the headhunter, Michael King, whom they hired after their termination, and the economic expert witness, Michael Soudry, who prepared detailed economic analysis reports with respect to each Respondent as noted above. Mr. King testified about how damaging statements about market timing were on a Form U-5 and then how press statements would further affect a broker with a negative Form U-5. (Tr. 3131-3132.) King stated that in terms of future employability, "the U-5 would arrange for the coffin. The [*35] press would be the final nail that would be put in." (Tr. 3132.) King testified that getting a job with a Form U-5 such as Respondents had was difficult and that "[t]he press made it even more difficult." (Tr. 3132.) And even with expungement of the Forms U-5, King testified that "no major firm is going to touch them . . . [b]ut a small firm would take them." (Tr. 3132-3133.) The Awards of $ 4.5 million in damages to each of Savino and Chung, which included amounts for pain and suffering, fall squarely within, closer to the low end of Soudry's range of damages, which did not account for pain and suffering. The Award of $ 3.5 million to Brunnock was nominally above the range suggested by Soudry's analysis but such amount was expressly noted by the Panel to include an amount for pain and suffering. While Merrill Lynch did call witnesses, it did not call any expert witness to attempt to counter the testimony of King and/or Soudry. (See Ward Aff., Ex. O, Respondent's Post-Hearing Brief, dated November 17, 2005, ("Res. Post-Hearing Br.").)

As noted above, a statement made in the context of and pertaining to a person's trade, profession or business . . . is actionable [without [*36] the need to prove actual

Case 1:08-cv-00706   Document 58-3   Filed 05/16/2008   Page 9 of 14
Case 1:08-cv-00706   Document 45-15   Filed 03/31/2008   Page 10 of 16

Page 9

2007 U.S. Dist. LEXIS 23126, *

harm] if the statement is made with reference to a matter of significance and importance relating to the manner in which the subject of the statement carries out his trade, profession, or business." *Lutz v. Royal Ins. Co. of America, 245 N.J. Super. 480, 586 A.2d 278, 284 (N.J. Super. Ct. App. Div. 1991)*; see *Jobes v. Evangelista, 369 N.J. Super. 384, 849 A.2d 186, 193 (N.J. Super. Ct. App. Div. 2004)*(holding that the element of proof of special damages in the form of pecuniary or economic harm to reputation is waived if the statement is deemed slander per se because damage to reputation is presumed to flow from such statements).

The statements at issue here, when viewed as a whole, could be considered defamatory per se because they were all related to Respondents' employment at Merrill Lynch. While only one of the newspaper articles mentions any of the Respondents by name, there are other identifying elements mentioned in the statements, including that there were three brokers, who had worked at UBS previously, and who were terminated from the New Jersey branch office of Merrill Lynch. Also, the Respondents testified to the Panel that they were fairly well-known [*37] in the industry and were known to be partners with each other, including with Respondent Chung, who was named in one article. At least one Respondent testified that, after publication of the newspapers articles, he knew that people in the industry knew the articles were written about the Respondents because "I had phone calls, the phone was ringing off the hook." (Tr. 3635.)

It would not have been in manifest disregard of any explicit law for the Panel to have concluded that the statements, when viewed as a whole and evaluated with the testimony of the Respondents, were defamatory and, indeed, per se defamatory as they clearly related to Respondents' profession. The statements could have been evaluated as injurious to Respondents' professional reputation, and, while it is necessary for defamation that the statements be "of and concerning the complaining party," *Durski v. Chaneles, 175 N.J. Super. 418, 419 A.2d 1134, 1135 (N.J. 1980)*, the actual naming of a plaintiff is not a necessary element in an action for defamation, *Dijkstra v. Westerink, 168 N.J. Super. 128, 401 A.2d 1118, 1120 (N.J. Super. Ct. App. Div. 1979)*(holding that it "is enough that there is a such reference to [the plaintiff] [*38] that those who read or hear the libel reasonably understand the plaintiff to be the person intended"). [4] New Jersey law looks at the listener's reasonable interpretation, which will be based in part on the context in which the statement appears, as the proper measure for whether the statement is actionable. *Ward, 643 A.2d at 980*; see *Gnapinsky v. Goldyn, 23 N.J. 243, 128 A.2d 697 (N.J. 1957)* (noting that in cases where the plaintiff is not explicitly identified, "it must appear that the third person understood the communication to relate to plaintiff . . . the identification of the person defamed may be so evident and the extent of the publication such as to warrant an inference that the published statement was understood by at least some third person to bear upon plaintiff").

 4  Merrill Lynch's argument that Respondents are "libel-proof" is rejected. The libel-proof doctrine was developed for certain cases where plaintiffs already had extensive criminal records and states that a plaintiff who has established such a bad reputation that he cannot show injury to his reputation is libel-proof and thus cannot maintain an action for defamation. See *Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 303 (2d Cir. 1986)*(holding that under libel-proof doctrine a "plaintiff's reputation with respect to a specific subject [is] so badly tarnished that he cannot be further injured by allegedly false statements on that subject"); *Cardillo v. Doubleday & Co., Inc., 518 F.2d 638 (2d Cir. 1975)*; 53 C.J.S. Libel and Slander; Injurious Falsehood § 15 (2007). However, it does not appear that this doctrine has been explicitly embraced or addressed by New Jersey law and thus is not an explicit law that was manifestly disregarded by the Arbitration Panel. In addition, the libel-proof doctrine is generally applied with caution, "since few plaintiffs will have so bad a reputation that they are not entitled to obtain redress for defamatory statements." See *Guccione, 800 F.2d at 303*.

[*39] In sum, because the Panel did not give an explanation for the Award, it is not clear what statements it relied on to find that Respondents deserved the Award for defamation. However, based on the extreme deference that a court must give to the arbitrators' decisions, the defamation part of the Award must be confirmed because there is more than "a barely colorable justification for the outcome reached," namely, for finding defamation based on either the statements on the Forms U-5 or the statements made to the press or other audiences (the Gorman speech and the Herr directive), or some combination thereof. *Willemijn, 103 F.3d at 13*; see *Wallace, 378 F.3d at 190*.

D. Truth as Defense to Defamation

Merrill Lynch asserts that even if any of the statements attributed to Merrill Lynch was defamatory, truth is a defense to defamation, and the statements were truthful. (Petitioner's Reply Memorandum of Law in Further Support of Petition to Partially Vacate Award and in Opposition to Cross-Motion to Confirm, dated April 14, 2006, ("Pet. Reply Memo"), pp. 4-5.) Under New Jersey law of defamation, truth, if established, is a defense to

Case 1:08-cv-00706   Document 58-3   Filed 05/16/2008   Page 10 of 14
Case 1:08-cv-00706   Document 45-15   Filed 03/31/2008   Page 11 of 16

Page 10
2007 U.S. Dist. LEXIS 23126, *

defamation. *Lawrence v. Bauer Publishing & Printing Ltd., 89 N.J. 451, 446 A.2d 469, 473 (N.J. 1982)* [*40] (noting that "for the defense to apply, however, the truth must be as broad as the defamatory imputation or sting of the statement")(internal citations omitted); see, *Reilly v. Gillen, 176 N.J. Super. 321, 423 A.2d 311 (N.J. Super. Ct. App. Div. 1980)*. Merrill Lynch argues that the statements at issue "all reported in essence that Merrill fired the CBS Group for engaging in improper trading practices that violated Merrill's policy against market timing" and that the CBS Group did engage in such improper conduct. (Pet. Reply Memo at pp. 5-6.) The two sides had equal opportunity to present to the Panel evidence about how Respondents conducted their business transactions and what Merrill Lynch's policies and supervision were. Respondents denied that they engaged in improper market timing against Merrill Lynch's policy. (See e.g., Tr. 383-84, 397, 1217-1219, 2638-39, 2707-2708.) In the Award, the Panel directed Merrill Lynch to amend the Forms U-5 to state that the Respondents were fired "not for cause," which reflects that the Panel did not find the statements on the Forms U-5 to be true. In *Acciardo v. Millennium Sec.*, a case with similarities to the current action, the Court held: [*41]

> The amendments [to the arbitration claimant's defamatory U-5] ordered by the Arbitration Panel were significant [because . . . . t]he new Form U-5 as amended would state only that Acciardo was terminated for "failure to perform duties" and that he was the subject of a consumer-initiated complaint . . . . Based on the amendments ordered by the Panel, it is clear that the Panel did not find the statements on the original Form U-5 to be substantially true. Thus, the Panel did not act in manifest disregard of the law in awarding damages based on the defamatory statements.

*83 F. Supp. 2d at 421.*

Here, the Panel was free to accept or reject evidence related to the truth of the statements, as long as it did not ignore clear, explicit law. Indeed, as noted in the facts above, Merrill Lynch proffered evidence of the administrative complaint against Respondents filed by the Attorney General of New Jersey on behalf of the Bureau of Securities of the State of New Jersey which was ongoing at the time of the Arbitration. However, the Panel refused to accept the evidence because it was a proceeding before another authority in which there had been no final determination. [*42] [5] The Panel noted that its "decision is based on evaluating the testimony, the exhibits, the presentation of the case from both sides . . . ." (Tr. 2461.) Such a decision was within the purview of the arbitrators.

> 5   There is no indication in the record that Merrill Lynch sought to reopen the record before the Panel or otherwise to bring to its attention the final conclusion of the New Jersey Bureau of Securities, which resulted in revocation of each of the Respondents' brokerage license.

In addition, there was evidence introduced by Respondents that Merrill Lynch's market timing policy was vague and unworkable. Curtis Brown, who was a manager in the New Jersey branch office in charge of the Respondents, agreed with one of the arbitrators who expressed continued confusion as to what exactly market timing was, and Brown testified that "from a market timing standpoint, I'm in agreement that it was very nebulous as we tried to sort out what is the appropriate definition" and noted that he made every effort to try [*43] to figure out what the definition might be. (Tr. 4738.) Dan Sontag, who testified that he personally ordered that Respondents be terminated (although he did not direct that their termination be "for cause"), could not identify the specific Merrill Lynch directives violated by Respondents. (Tr. 5184.) Similarly, when asked about directives he claimed he gave to Respondents about certain market trading activities, Brown could not find any examples of specific directives given in writing to Respondents. (Tr. 4461-4470.) In addition, William Rittling, the Head of Merrill's Non-Proprietary Mutual Funds unit, and William Bridy, President of Merrill's Financial Data Services, both of whom were involved in creating the market timing policy, acknowledged that Merrill Lynch's market timing policy was vague, "very ill-defined" and more difficult to execute than to write. (Tr. 3753-55, 4168.) Indeed, Mr. Bridy testified that rather than having a clear policy on market timing because the definition of market timing was still evolving, "what we attempted to do was say we have something where we have the spirit, we're attempting to address the spirit, trying to address the intent . . . ." (Tr. 3754.)

[*44] Because the Panel did not explain its Award, the Court must attempt to infer from the record whether the arbitrators appreciated and ignored a clearly governing legal principle. *Bear Stearns, 409 F.3d at 91*. It is evident from the record that there is no clear law governing market timing, and even Merrill Lynch's own attempt to create an internal company policy to monitor it proved difficult. Respondents denied engaging in improper market timing and, in support of their actions, presented evidence to show that they did not engage in improper actions, including demonstrating that, while employed at Merrill Lynch, their supervisors: (i) never rejected or

Case 1:08-cv-00706   Document 58-3   Filed 05/16/2008   Page 11 of 14
Case 1:08-cv-00706   Document 45-15   Filed 03/31/2008   Page 12 of 16

2007 U.S. Dist. LEXIS 23126, *

Page 11

reversed a single trade or closed or refused to open any accounts deemed to be for the purpose of "market timing," which they would be required to do if a trade violated any Merrill market timing policy; and/or (ii) had not disciplined any of the many other brokers who engaged in the same kinds of short-term mutual fund trading as Respondents. (See Wech. Aff., Ex. 20 (Cl.21 at p.7 of 11), Ex. 22 (Cl. 40, 41, 84), Ex. 23 (Cl. 138), Ex. 4 (Cl. 26, 27).) Although Michael King, the headhunter, stated in letters to potential [*45] employers that the Respondents had engaged in market timing, he testified that he did so because he was obligated to disclose what had been stated on Respondents' Forms U-5. [6] (See Res. Sur-Reply Memo at p. 8.) Therefore, because of the uncertainty of the law and of Merrill Lynch's rules regarding market timing and the conflicting evidence as to whether Respondents' practices violated any law or rules, the Court cannot find that the Panel manifestly disregarded the law of defamation in finding that Merrill Lynch had not proved the truth of the statements at issue.

> 6   Merrill Lynch uses a hypothetical discussion between Respondent Chung and Steven Markovitz to assert that the Respondents admitted to market timing, but, as that was not an explicit admission to a specifically-defined market timing policy, the Arbitration Panel was permitted to weigh it accordingly and disregard it if it so chose.

F. Causation

The Panel did not manifestly disregard the law of causation. Respondents gave lengthy testimony [*46] to support the finding that their damages were caused by Merrill Lynch's statements as well as presenting expert witnesses who corroborated that such statements caused loss and what a valid estimate of such loss might be.

III. Public Policy

Merrill Lynch asserts that the Award must be vacated because public policy does not allow an award to deviate materially from reasonable compensation and there was no objective, third-party evidence to support an award for pain and suffering, and no evidence that the statements caused any lost income. (First Amended Pet. P 46.) Merrill Lynch argues that the Award violates the public policies that a wrongdoer should not be permitted to profit through his own wrongdoing and that those who reveal illegal activities of others should not be punished for doing so. (Pet. Reply Memo at p.14 (citing *Commercial Union Insurance v. Lines*, 378 F.3d 204, 208-09 (2d Cir. 2004)) and p. 17.)

Merrill Lynch presents evidence by which it purports to demonstrate that Respondents engaged in improper trading and therefore should not benefit from the Award determined by the Panel. (Pet. Reply Memo at p. 15.) The evidence offered by Merrill Lynch [*47] includes the regulatory enforcement orders of the NYSE, New Jersey Bureau of Securities and Connecticut Department of Banking penalizing Merrill $ 13.5 million for failure to curb the CBS Group's "market timing activities," (see Nelson Decl., Ex. 1 at 12; see also id. PP 22-51; PP 54-59); see also id. at 12 (Connecticut sanctions); Nelson Decl., Ex. 2 (Consent Order issued by New Jersey Bureau of Securities) PP 2, 7-15, 22.); the $ 53.5 million fine imposed upon Respondents' previous employer UBS Paine Webber by the New Jersey and Connecticut authorities and the NYSE (see (Merrill Memo of Law in Support, at p. 7 n.4; Nelson Decl., Ex. 3 PP 25-39)); the SEC order fining Millenium and various other respondents over $ 180 million based in part on its market timing activities (Nelson Decl., Ex. 6); and the order of the New Jersey Bureau of Securities suspending Respondents' securities licenses pending the hearing of the administrative complaint (Nelson Decl., Ex. 5). Merrill Lynch claims that although not all of this evidence is part of the arbitral record, the Court is not limited to that record in assessing whether the Award violates public policy because "the question [*48] of whether enforcement of an award would violate public policy is ultimately one for resolution by the courts." *Local 97 v. Niagra Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999) (internal quotation omitted). But in the same case the Court of Appeals went on to note that "authority to answer that question does not afford courts 'authority to disagree with [the arbitrator's] honest judgment' about the proper remedy to be awarded in a given case." Id. (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987)). Since the review of an arbitration award is severely limited, "before a court may intervene with an arbitration award on policy grounds, it must be able to examine an arbitration agreement or an award on its face, without engaging in extended fact-finding or legal analysis, and conclude that public policy precludes its enforcement." *Cohoes Police Officers Union, Local 756 ex rel. Westfall v. City of Cohoes*, 263 A.D.2d 652, 654, 692 N.Y.S.2d 796 (N.Y. App. Div. 3d Dep't 1999) (internal quotation omitted).

Indeed, the Supreme Court in United Paperworkers Int'l Union reversed the vacatur of an arbitration award and cautioned that, in order to [*49] justify vacatur on grounds of public policy, a public policy must be "explicit," "well-defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." 484 U.S. at 43 (1987) (internal citation omitted); see *New York State Correctional Officers v. State of New York*, 94 N.Y.2d 321, 726 N.E.2d 462, 466, 704 N.Y.S.2d

Case 1:08-cv-00706    Document 58-3    Filed 05/16/2008    Page 12 of 14
Case 1:08-cv-00706    Document 45-15    Filed 03/31/2008    Page 13 of 16

2007 U.S. Dist. LEXIS 23126, *

Page 12

*910 (N.Y. 1999)* (stating that a court may vacate an award only "where strong and well-defined policy considerations embodied in constitutional, statutory, or common law prohibit a particular matter from being decided or certain relief from being granted by an arbitrator"). Thus, a court may not vacate an award on public policy grounds "when vague or attenuated considerations of a general public interest are at stake." Id.

The public policy against a wrongdoer's benefiting from his wrongs is not a widely recognized, explicit public policy. Respondents presented evidence that they did not engage in wrongdoing, and the Panel concluded that the allegations of wrongdoing made by Merrill Lynch in at least some of its statements were not true, whereas the cases cited by Merrill Lynch [*50] to support this public policy argument involve arbitration awards where the arbitrators found the claimants to be guilty of wrongdoing. Even if there were wrongdoing, it does not necessitate a violation of public policy to make an award to a claimant who acts wrongly. See also, *Apuzzo v. County of Ulster, 98 A.D.2d 869, 870, 470 N.Y.S.2d 814 (N.Y. App. Div. 3d Dep't 1983)* (noting that even an individual's reprehensible conduct does not trigger this "increasingly more narrowly restricted" exception to the "general rule against judicial interference" with arbitration awards). The issue before a court in reviewing an arbitration award based on a violation of public policy is "not whether we [the court] agree with the arbitrator's assessment of the evidence . . . or reasoning in fashioning the award," and a court may not vacate an award "because the facts or implications of a case might be disturbing, or because an employee's conduct is particularly reprehensible." *New York State Correctional Officers, 726 N.E.2d at 466* (affirming arbitration award reinstating employee to his position as correctional officer, with full pay, notwithstanding the employee's having flown [*51] a Nazi flag on the porch of his home).

Merrill Lynch's argument that the Award violates public policy because a party should not be punished for revealing illegal activities is also rejected. The only case that Merrill Lynch presents in support of this argument is *In re UBS Warburg LLC., No. 00-119163, 2001 N.Y. Misc. LEXIS 1324 (N.Y. Sup. Ct., N.Y. Cty., Oct. 2, 2001)* ("UBS I"), which had very different facts from the ones presented here, including the fact that the arbitration panel in that case irrationally refused even to consider the applicable law which governed the dispute. The reviewing court found that the arbitration panel, other than one dissenting member: (i) "did not know a basic regulation impacting on strong public policy"; (ii) affirmatively "stated that it was going to ignore the law,"; (iii) "bizarre[ly]" "prohibited the parties from citing more than three decisions in their post-hearing briefs . . . without any explanation even after a written request [to alter the limitation] was made;" and (iv) "refused to permit UBS to provide legal authority that contradicted [the claimant's state law claim] . . . ." *Id. at \*9-11*. The court in [*52] UBS I explicitly based its vacatur of the award upon the "arbitration panel's irrational refusal to even consider the applicable law which governed the dispute." *Id. at \*15*. Finally, in *UBS I*, unlike in this case, it was "undisputable" that the claimant violated SEC regulations and the claimant did "not even contest that a violation [of SEC regulations] required it to cease operations . . . ." *Id. at \*16*. Here, the Panel did not irrationally refuse to consider any applicable law, and a review of the record shows that the Panel could have rationally concluded that the statements by Merrill Lynch about Respondents were untrue and defamatory and caused injury, including pain and suffering, to the Respondents. Thus, the concern for not punishing a party that reports on another's illegal activities is not at issue here because the Panel appeared to conclude that Respondents did not engage in illegal or improper activity.

Merrill Lynch argues that the Award violates public policy or is irrational because the Award was beyond reasonable compensation, but, even if true, that fact would be insufficient to justify vacating an award. While a court may overturn an excessive [*53] punitive damages award, a court may not vacate a compensatory award merely because it believes it to be excessive. "An excessive award which shocks the conscience is not a ground to vacate an arbitration award . . . ." *In re Brown & Williamson Tobacco Corp., 7 A.D.3d 368, 371 n.8, 777 N.Y.S.2d 82 (N.Y. App. Div. 1st Dep't 2004)*. The Award did not specify what portion was for lost income and what portion was for pain and suffering, so it is not clear that the Court can even determine if the compensatory award is excessive. Also, Respondents presented evidence of damage through their own testimony that was properly accepted by the Panel and given whatever weight the Panel believed was proper. The Court is not in the position when reviewing an arbitration award to question how the arbitrators weighed evidence, including testimony. Again, the Court must confirm the Award if there is even a barely colorable justification for the Award even if the Court disagrees with result.

IV. Attorneys' Fees

Merrill Lynch asserts that the Panel had no power to award attorneys' fees because there was no express agreement between the parties to permit such an award. See *Asturiana de Zinc Mktg., Inc. v. LaSalle Rolling Mills, Inc., 20 F. Supp. 2d 670, 674-75 (S.D.N.Y. 1998)*. [*54] [7] The only agreement at the time Respondents became employed by Merrill Lynch concerning attorneys' fees was a one-way fee clause in the Promissory Notes limiting the award of fees solely to Merrill Lynch

Case 1:08-cv-00706    Document 58-3    Filed 05/16/2008    Page 13 of 14
Case 1:08-cv-00706    Document 45-15    Filed 03/31/2008    Page 14 of 16

2007 U.S. Dist. LEXIS 23126, *

Page 13

in the event it prevails in its efforts to collect sums due under the Promissory Notes. (See Ward Aff., Exs. D, E, F (Promissory Notes appended to Contracts) at p. 2 ("In the event legal proceedings are required to be brought for collection of any amount under this Promissory Note, the undersigned promises to pay reasonable attorney's fees").) Merrill Lynch asserts that the award of attorneys' fees was beyond the Panel's authority because the contracts at issue "expressly addressed (and limited)" the arbitrators' power to award attorneys' fees, and nothing in the record supports an inference that Merrill Lynch agreed to a modification of the one-way fee arrangements. (See Pet. Reply Memo, at p. 19.) (emphasis in original). However, it is not clear that the provision for Merrill Lynch to recover attorneys' fees under the Promissory Notes expressly covers the issue of attorneys' fees in the Employment Contracts as well. In *In Re UBS Warburg LLC, 294 A.D.2d 245, 246, 744 N.Y.S.2d 364* [*55] *(N.Y. App. Div. 1st Dep't 2002)* ("UBS II"), the First Department affirmed the New York Supreme Court's vacatur of an arbitration award where the arbitrators manifestly disregarded the law and noted that the award of attorneys' fees was beyond the arbitrators' authority because the parties' agreement expressly addressed attorneys' fees, granting them only to petitioners and making no reciprocal provision for the respondents. However, unlike in *UBS II*, while the Promissory Notes signed by Respondents addressed attorneys' fees, Respondents also had Employment Contracts with Merrill Lynch that (i) contained no integration clause; and (ii) were silent on the issue of attorneys' fees, meaning that the Employment Contracts do not expressly address that issue and what is contained in the Promissory Notes does not clearly apply to the Employment Contracts.

> 7   In Asturiana, the reviewing court found that, generally, under New York law, attorneys' fees shall not be awarded in arbitration unless provided for in the agreement to arbitrate. *Id.* at 674. However, the court went on to cite a Court of Appeals case stating that "a choice of law provision will not be construed to impose substantive restrictions on the . . . right to arbitrate claims for attorneys' fees." Id. (citing *Paine Webber Inc. v. Bybyk, 81 F.3d 1193, 1202 (2d Cir. 1996)).*

[*56] In addition, "parties may also acquiesce in the awarding of [attorneys'] fees by their conduct at the arbitration." *Spector v. Torenberg, 852 F. Supp. 201, 210 (S.D.N.Y. 1994);* see *Synergy Gas Co. v. Sasso, 853 F.2d 59, 64 (2d Cir. 1988);* see generally *Kamakazi Music Corp. v. Robbins Music Corp., 684 F.2d 228, 231 (2d Cir. 1982)* ("It is hornbook law that parties by their conduct may agree to send issues outside an arbitration clause to arbitration."). As part of the Arbitration, Merrill Lynch signed the NYSE Uniform Submission Agreement and also sought attorneys' fees itself in its Statement of Answer and Counterclaims submitted to the Arbitration Panel. (Ward Aff., Ex. I, PP 97, 100, subsections (e), (g) of WHEREFORE clause on p. 39.) In *Neuberger & Berman v. Donaldson, Lufkin & Jenrette Sec. Corp., MC 65-16833/91 (N.Y. Sup. Ct. N.Y. Cty., Apr. 6, 1992)* (unpublished opinion), the court rejected a petition to vacate an NYSE arbitration award which awarded attorneys' fees. There, the petitioner had: (i) filed with the NYSE a Uniform Submission Agreement which stated that "[t]he undersigned parties hereby submit the present [*57] matter to controversy as set forth in the attached Statement of Claim . . . to arbitration," and (ii) submitted to the NYSE a Statement of Claim that sought recovery for attorneys' fees. Id. There the court determined that the arbitrators were within the scope of their authority to decide the issue of attorneys' fees. Accord *First Interregional Equity Corp. v. Haughton, 842 F. Supp. 105 (S.D.N.Y. 1994).*

By filing Uniform Submission Agreements with the NYSE, both parties here agreed to be bound by the Constitution and Rules of the NYSE, including NYSE Rule 629 which provides that "[i]n addition to forum fees, the arbitrator(s) may determine in the award the amount of costs incurred pursuant to Rules 617, 619 and 623 and, unless applicable law directs otherwise, other costs and expenses of the parties. The arbitrator(s) shall determine by whom such costs shall be borne." The terms "other costs and expenses" include attorneys' fees. *First Union Secs., Inc. v. Lorelli, 168 N.C. App. 398, 607 S.E.2d 674, 677 (N.C. App. 2005); Prudential-Bache Secs. v. Tanner, 72 F.3d 234, 242-43 (1st Cir. 1995).* The Court of Appeals has also noted that there is [*58] a "long standing rule that any doubt concerning the scope of the submission agreement is to be resolved in favor of coverage" meaning that if an element of the submission to arbitration is ambiguous, the court should interpret it as being covered by arbitration and therefore granting arbitrators the right to decide that issue. *Synergy Gas Co., 853 F.2d at 64.*

The award of attorneys' fees also is not barred by *New York C.P.L.R. § 7513* which provides that "[u]nless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, not including attorney's fees, incurred in the conduct of the arbitration, shall be paid as provided in the award." The Court of Appeals noted in Synergy Gas Co. that *Section 7513* "does not bar the award of attorney's fees; it merely does not grant authority to do so." *853 F.2d at 65.* The deference accorded to arbitrators' decisions as well as the evidence that Merrill Lynch signed the Uniform Submission Agreement, where it agreed to be bound by the Rules of the NYSE, and that Merrill Lynch sought attorneys' fees in its Statement of Claim to

the Panel [*59] leads to the conclusion that the arbitrators' award of attorneys' fees was not in manifest disregard of the law.

## CONCLUSION

For the foregoing reasons, Merrill Lynch's petition to vacate the Arbitration Award is denied, and Respondents Brunnock, Chung, and Savino's cross-motion to confirm [dkt. no. 9] is granted.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated: New York, New York

March 23, 2007

LORETTA A. PRESKA, U.S.D.J.